NIMMER, Appellant, v. PURTELL, Respondent.

*No. 496. Argued February 5, 1975.—Decided June 16, 1975.*
(Also reported in 230 N. W. 2d 258.)

For the appellant there were briefs by *Schwartz, Schwartz, Roberts & Cairo,* attorneys, and *Thompson, Evans, Hostak & Clack* of counsel, all of Racine, and oral argument by *James W. Hill* of Racine.

For the respondent there was a brief by *Schoone, McManus & Hanson, S. C.* of Racine, and oral argument by *Adrian P. Schoone.*

DAY, J. This is an appeal from the judgment dismissing the complaint of the plaintiff on its merits, which also incorporated an order denying a motion for a new trial. The order denying plaintiff's motion for a new trial was entered August 2, 1973, and judgment on the verdict was entered August 21, 1973. From this judgment, plaintiff Wilbur Nimmer appeals.

Plaintiff-appellant Wilbur Nimmer (Dr. Nimmer) was on January 20, 1969, when the alleged cause of action arose, a duly licensed physician of osteopathic medicine. He operated a clinic in Sturtevant, which he had opened in 1958. In September, 1968, he hired the defendant-respondent Neil Purtell (Dr. Purtell), who was also a duly licensed physician of osteopathic medicine, to work at the clinic. The latter was a salaried employee of

Dr. Nimmer and continued to be such until the relation-ship ceased in March of 1970.

During December of 1968, the plaintiff, Dr. Nimmer, had a case of flu. He missed no work and was able to drive his family to Louisiana and Florida and back, returning in January of 1969. During that trip the plaintiff experienced recurrent neck aches which he relieved by taking aspirin. The condition continued to bother him on his return.

On January 20, 1969, the plaintiff came to his clinic about 10 a.m. His neck was bothering him at the time and, according to the plaintiff, when he arrived at work he told the defendant Dr. Purtell of the pain and asked him to look at it. He testified that the defendant told him to lie down and proceeded to manipulate the plain-tiff's neck. Plaintiff said he felt a pain in the back of his skull and that he told the defendant about it but the defendant paid no attention and left the room to attend his patients.

The testimony of the defendant varies considerably from the plaintiff's version. The defendant said that when he saw the plaintiff at the clinic on the morning of January 20th the plaintiff did complain about pain in his neck but did not ask the defendant to look at his neck; rather, plaintiff pointed to the back of his neck and said "Crack my neck." This was described as a simple manipulation and part of osteopathic treatment, which the defendant had been performing for a number of years. The defendant testified he figured the plain-tiff knew what he needed and he was glad to oblige and did in fact manipulate the plaintiff's neck in the manner requested. The defendant then left to attend to his patients at the clinic.

After this treatment, the plaintiff went to various area hospitals to see patients and returned to the clinic around noon. He requested his receptionist to get him

a sandwich, which she did. She stated that when it was delivered the plaintiff gave no indication of not feeling well. The plaintiff testified that he next saw the defendant at the clinic at about 12:45 p.m. and told him that his neck still hurt and asked the defendant to again take a look at it. According to the plaintiff's testimony, the defendant asked him to lie down and performed another manipulation on his neck, which plaintiff said resulted in a pain "like a hot poker" shooting up to the same place at the back of plaintiff's skull near the junction with the neck. He said he again told the defendant of this pain but the defendant did not reply and left the room. Plaintiff further testified that after the defendant left the room the clinic's registered nurse, Jane Champley Christensen, came in and the plaintiff asked her to perform diathermy treatment to relieve the pain, which she did. The plaintiff could not recall if that treatment was successful. He said he told the nurse that his arm felt like it was floating in the air and he testified he then staggered down the hall because he wanted to lie down on the carpeted floor of another doctor's office in the clinic. He claimed he felt light-headed, giddy and euphoric. The defendant had no recollection of a second manipulation and in a pretrial deposition the plaintiff made no reference to a second manipulation. The defendant testified he left the clinic about noon to go home for lunch and had planned to remain out of the clinic since it was his afternoon off. However, he received a call to return to the clinic to attend the plaintiff's patients because the plaintiff was not feeling well. He testified that when he returned, he first saw the plaintiff lying on the carpeted floor of the other doctor's office and that Nurse Christensen was in attendance. Defendant was told by the plaintiff that he was not feeling well and that the defendant should look after plaintiff's patients. Plaintiff said he

would be all right. The plaintiff told defendant that he thought he was suffering from the aftereffects of the flu and defendant knew that plaintiff and his family had suffered recently from the flu.

The plaintiff spent the remainder of the afternoon on the floor of the office. The nurse remained with him and the defendant looked in on him on several occasions. The plaintiff vomited intermittently into a pan and slept intermittently on the floor. Plaintiff testified that when he laid on one side and then rolled to the other, he felt like he was on the ceiling and that he so informed the nurse. She testified she asked plaintiff if she could help him, if she could call someone, and if he would like to go home; but that the plaintiff said he would be fine, that he wanted only to be left alone and would prefer if she not stay with him but would help the defendant with the patients. The nurse testified that she and the defendant and the receptionist all suggested that the plaintiff's wife be called, but that he refused and insisted that he would be all right. They all testified that the plaintiff was lucid and rational when making these statements and the nurse testified he was never unconscious or incoherent throughout the afternoon. He was coordinated and alert enough to give orders and he very definitely rejected suggestions to call his wife or to call the hospital for a specialist. She said he appeared rational and oriented throughout, even during the vomiting spells. She said she did not overrule him and call anyone else because he was her boss and told her not to.

The defendant was in and out of the room several times during the afternoon. He did not conduct any tests although there was testimony that the plaintiff did prescribe an antivomiting injection and an injection of vitamins which the nurse administered. The defendant said he did not conduct any tests or make a

diagnosis for the reason that the plaintiff was telling him the diagnosis and that he did not consider the plaintiff to be his patient. He said the plaintiff was lucid, oriented, completely rational, and totally "co-ordinated in everything he said," and that he so remained whenever the defendant was present throughout the afternoon.

He testified he would not have considered the plaintiff a patient until or unless the plaintiff had lost lucidity and rationality. He further testified that he agreed with the plaintiff's self-diagnosis that the symptoms were generally those of the flu which was prevalent in the area at that time. The plaintiff had told the defendant that he vomited very easily and did not indicate any particular discomfort. The defendant described the plaintiff as an extremely hard-driving, domineering person, one who influences people around him down to the smallest detail. He said he regarded the plaintiff as very uninhibited, very unreserved, and for this reason he found nothing unusual in the plaintiff's preferring to lie on the carpeted floor and vomit into a bucket rather than to do such in a toilet. When defendant suggested that the plaintiff go home or that his wife be called, the plaintiff responded he did not want his wife called and was comfortable where he was and that others should just let things be. He further testified that there was no change in plaintiff's temperament or personality from what it usually was throughout the afternoon until the plaintiff was taken home about 6 p.m. When it began to get dark the plaintiff suggested that he be taken home to allow the doctor whose office he was lying down in to have evening office hours. The plaintiff realized that he could not walk when he attempted to because he had no feeling in his right leg and it was at this time that the defendant became aware that there were signs of neurological involvement.

The defendant and a pharmacist in the building helped the plaintiff to his home, which was within two blocks of the clinic. The pharmacist also testified that the plaintiff seemed rational and oriented and was joking about his condition.

When the plaintiff arrived home, his wife phoned the fire department rescue squad. The chief of that squad testified the plaintiff seemed incoherent and made no sense in his conversation. Because the plaintiff could not walk, they transported him on a cot.

The admitting data sheet at the hospital listed plaintiff as "alert and oriented" upon arrival. The plaintiff's family physician, Dr. McHale, took the plaintiff's medical history after admission to the hospital and that history says that the plaintiff "directed his associate to manipulate his neck." Dr. McHale testified that when he took the plaintiff's history, plaintiff was completely alert, responsive, and oriented. Following various tests, it was determined that the plaintiff had suffered a type of stroke known as a Wallenberg syndrome. Expert witnesses for both parties testified that the Wallenberg syndrome does not impair judgment or the ability to diagnose; people undergoing it are alert and oriented and it does not affect rationality. While the victim feels sick, he can tell that he is sick and knows what is going on around him. The testimony as to the cause of the stroke was in conflict; some was to the effect that the stroke was brought on by the manipulation of the neck, and other testimony was that the manipulation was not the cause but rather the stroke was the result of an arteriosclerotic plaquing of his posterior inferior cerebral artery. All medical witnesses, including those on behalf of the defendant, agreed that the defendant should have at least made a diagnosis at some point during the afternoon of the condition. However, even one of those witnesses testified "Dr. Nimmer is an extremely

forceful and astute physician and if I was the employee I would think several times before going over his diagnosis and not acceding to his wishes."

The plaintiff at the time of trial had returned to a full and busy routine of work but estimated he was working about only 60 percent of his prestroke capacity. Two of his three expert witnesses testified that he was disabled by 20 to 30 percent; the third, however, said he saw no objective signs of functional disability.

At no time on January 20, 1969, did the plaintiff complain to the defendant or to anyone else about the manipulations that the defendant administered. The defendant ran the clinic by himself for five months during the plaintiff's absence and continued to work for the plaintiff for over a year. The defendant testified that the plaintiff had never questioned him or commented to him about the treatment or lack of treatment on January 20, 1969, and that the commencement of this lawsuit was his first knowledge of the challenge to his actions on that date. The complaint in this action was served on January 12, 1972, just within the three-year statute of limitations.

Questions were submitted by the trial court to the jury as to the negligence and causality of such negligence of both the plaintiff and the defendant; the jury found both causally negligent and found the plaintiff to be 57 percent contributorily negligent, the defendant 43 percent negligent and damages to be $19,000.

On the question of possible contributory negligence, plaintiff alleges the trial court committed reversible error in its instruction to the jury as to the standard of care the plaintiff, Dr. Nimmer, should be held to in caring for his own health during the time in question.

The trial court instructed the jury in part as follows:

"You are instructed that it was the duty of Wilbur Nimmer in caring for his own health on January 20,

1969, to exercise that degree of care, skill and judgment which is usually exercised under like or similar circumstances by the average osteopathic physician who is a general practitioner, having due regard for the advanced state of medical osteopathic science at the time in question. The mere fact that a bad result may have followed any treatment or lack of treatment which plaintiff Nimmer may have ordered or prescribed for himself, if you find in fact that he did order or prescribe any such treatment or lack of treatment, does not in itself require you to find that he was negligent in caring for his own health. If the plaintiff Nimmer exercised the degree of care, skill and judgment required of him as heretofore stated he cannot be found negligent simply on the basis of the results obtained. Dr. Nimmer was not required in caring for his own health to exercise the utmost or the highest degree of care and judgment known to the medical profession."

This is similar to the malpractice instruction which the court gave to the jury with respect to the defendant Dr. Purtell's duty toward the plaintiff.

The plaintiff had requested an instruction based on the concept of ordinary care.[1]

Counsel for the plaintiff maintains that the ordinary prudent-man rule, which they requested, should have been given but that the fact that the plaintiff was an osteopathic physician could have been included within the instruction. In a conference in chambers prior to submission of the instructions to the jury, plaintiff's counsel stated:

---

[1] "You are further instructed that the Plaintiff, Wilbur Nimmer, owed the duty to himself to exercise ordinary care with regard to his own safety and well-being. Ordinary care is the degree of care which the great mass of mankind ordinarily exercises under the same or similar circumstances. A person fails to exercise ordinary care when, without intending to do any wrong, he does an act or omits a precaution under circumstances in which a person of ordinary intelligence and prudence ought reasonably to foresee, that such act or omission will subject the person of himself to an unreasonable risk of injury or damage."

"We agree that the jury is entitled to consider the fact Dr. Nimmer is an osteopathic physician in measuring his conduct and that the instruction might well properly impart that fact to the jury. However, we believe his standard of care is still that of the ordinarily prudent man under the same or similar circumstances which would include the fact that he is an osteopathic physician."

The proposed form of instruction by the plaintiff as amended above was discussed by four of the justices in a majority opinion in the case of *Knutter v. Bakalarski* (1971), 52 Wis. 2d 751, 759, 191 N. W. 2d 235. That case involved an instruction on contributory negligence in the case of a fireman crossing a road in response to a grass fire. Three of the justices in the dissent found no special emergency and would not have required a special instruction. Four of the majority stated:

". . . understanding and clarity for the jury is best obtained by giving the specialized instruction in terms of an ordinarily prudent *workman* and not confuse the jury with a nonexistent ordinarily prudent *man* converted into a *workman* by indirection." (Emphasis added.)

What was said there with regard to the workman could be said here with regard to the osteopathic physician. The clearest instruction, and the one most appropriate to the circumstances, is the one that was given by the trial court.

The instruction given with respect to the plaintiff is essentially a malpractice instruction although the word "malpractice" was not used by the court. The plaintiff objects on the theory that one can only commit malpractice upon another and not upon oneself; we disagree. A doctor who undertakes to treat himself, either alone or in conjunction with another or directs another in his treatment or makes his own diagnosis and directs another to treat him accordingly, when it comes to a question of

contributory negligence in the joint treatment, can be as guilty of "malpractice" as he can be in treating another.

As the trial court observed, this was not an ordinary case.[2]

The plaintiff argues that the instruction as to his duty toward himself placed an emphasis on the defendant's theory of the case, that is, that the plaintiff Dr. Nimmer was in fact treating himself. Here, the plaintiff's theory is that he was too sick to prescribe for himself and left himself completely in the hands of the defendant. There is considerable credible evidence in the record to support the proposition that there was joint treatment as stated by the trial judge. However, the trial court's instruction clearly left it open to the jury to find that the plaintiff had not in any way prescribed for or treated himself or directed treatment of himself. The complained of instruction plainly provided: ". . . if you find in fact that he did order or prescribe any such treatment or lack of treatment . . . ." Under that instruction, if the jury had gone along with the plaintiff's theory it would have merely answered "No" to the special verdict question: "On January 20, 1969, was the plaintiff, Wilbur Nimmer,

[2] *"The Court* . . . . This is a most unique factual situation. It is unique in, first, we have one doctor suing another doctor for malpractice, probably a first in jurisprudential history. It is unique that the plaintiff was the employer of the defendant at the time of the alleged tort. It is unique in that the evidence shows, if believed by the jury, that the plaintiff himself prescribed and ordered treatment for himself, diagnosed his own condition and directed the defendant to perform the manipulations described in the evidence. . . .

"It isn't a case where Dr. Nimmer placed himself solely and with confidence under the care of Dr. Purtell. It just isn't that kind of a case. It is a case where two men were treating Nimmer, Purtell and Nimmer. . . .

"It would be in my opinion a gross misadministration of justice to tell a jury that Dr. Nimmer under the peculiar evidence of this case had only a duty to exercise the same degree of care and skill that a steel worker or a baker might exercise."

negligent with respect to caring for his own health?" The jury answered this question "Yes."

Improper self-treatment is certainly one aspect of contributory negligence in a medical malpractice case. Kimball, *Contributory Negligence as a Defense to Medical Malpractice in California,* 8 U. San F. L. Rev. (1973), 386; 1 Louisell and Williams, *Medical Malpractice* (rev. ed. 1970), p. 246, sec. 9.03.

Plaintiff cites the case of *Schoonover v. Holden* (Iowa 1901), 87 N. W. 737, for the principle that a patient has the right to rely upon the skill of the treating physician without assessing his care by consulting other physicians. In *Schoonover,* the Iowa Supreme Court approved the trial court's rejection of an instruction that the jury could consider the knowledge the plaintiff had of her condition as a result of consultation, if any, with non-treating physicians. But the reasoning behind the Iowa court's conclusion is different from the fact situation in this case. The Iowa court held that the proffered instruction was properly rejected:

". . . because it required the plaintiff to determine whether the defendant was giving her injury necessary treatment. She had the right to rely upon his professions of skill as a physician, without calling others in to determine whether he really possessed it or not, and she was not bound to call other physicians unless she was fully aware that he had not been and was not properly treating her injury." *Schoonover* at 737.

The plaintiff in *Schoonover* was not a doctor and had a right to rely on the doctor who was treating her without consulting others; that is critically different from the case at bar.

The plaintiff also calls our attention to the case of *Nelson v. Harrington* (1888), 72 Wis. 591, 40 N. W. 228. We do not regard this case as being in point. *Harrington* merely held that the father who brought action against a "clairvoyant physician" for malpractice in the treat-

ment of his son for a leg injury could not be held con-
tributorily negligent in seeking this type of treatment
even though he knew in advance what the treatment was.
The court held that one holding himself out as a physi-
cian, clairvoyant or not, was held to the same standard
as a regular physician in the diagnosis and treatment of
the patient's ailment. The court was principally con-
cerned with the public policy issues involved. The court
said at page 600:

"The proposition that one holding himself out as a
medical practitioner and as competent to treat human
maladies, who accepts a person as a patient and treats
him for disease, may, because he resorts to some peculiar
method of determining the nature of the disease and the
remedy therefor, be exonerated from all liability for un-
skillfulness on his part, no matter how serious the conse-
quences may be, cannot be entertained. The proposition,
if accepted as true, would, as already suggested, con-
travene a sound public policy."

We conclude that the trial court did not err in the
instruction it gave as to the standard of care required
of the plaintiff in this case.

The next question is, did the trial court commit preju-
dicial error by limiting cross-examination of the defend-
ant about the extent of coverage of his malpractice
insurance?

On direct examination the defendant was asked if he
bore any animosity against the plaintiff, Dr. Nimmer,
at that time. He said he did and when asked why by his
counsel, he stated:

"Well, first of all he tried to cheat me in business.
Secondly, in this suit he is endangering my family's
financial security."

Counsel for the plaintiff immediately objected that the
testimony was "prejudicial, improper, immaterial." Be-
fore the court had a chance to rule on it, the objection

was withdrawn. On cross-examination, counsel for the plaintiff asked the defendant, "Don't you have insurance which covers that matter?" Objection was raised and in the absence of the jury, the court stated that it would allow exploration of the point only of whether or not insurance existed but not the name of the company or the amount of the insurance. The defendant was then allowed to answer and he said, "Yes, in part." When asked what he meant by "in part," the defendant answered, "It doesn't cover the amount involved." A question by the plaintiff's counsel as to the amount involved was objected to and the objection was sustained; the court stated:

"Insurance has no bearing upon this lawsuit as to the amount of damage involved or as to the liability involved and the jury will be so instructed at the time I give the jury their charge and that is the reason for the last ruling."

That statement by the court was made in the presence of the jury and was repeated in the court's instructions. At the end of the trial, the jury was instructed that there was no question as to insurance or as to the financial security of the Purtell family in the special verdict and that no dispute of fact concerning those matters was involved in the case; that the liability or nonliability of the defendant Purtell for any damages proved is exactly the same whether or not he was covered by insurance. The jury was told it should answer the questions in the verdict just as it would if there had been no mention of either an insurance policy or the financial security of Dr. Purtell's family.

The plaintiff argues that it was prejudicial error for the trial court to limit its cross-examination of the defendant, which cross-examination was directed at curing the prejudice created by the defendant's statement that he was only partially covered by insurance.

The law in Wisconsin is clear that evidence of a defendant's liability insurance is immaterial and objectionable.[3]

Improper references to insurance are cause for a new trial only where prejudice results, and it cannot be presumed that prejudice resulted; rather, it is necessary to find affirmative evidence that the prejudice exists. *Roeske v. Schmitt, supra.* There this court said at page 572:

"... where, at most, the remarks of counsel [regarding insurance coverage] may have affected the jury in its consideration of the question of damages, they do not require a new trial, ... the excessiveness of an award of damages is considered as evidence that passion and prejudice have influenced it, and quite likely influenced the verdict on the issues, ... but the absence of an attack upon the award is significant in considering the asserted error, ..."

What is said with regard to comments by counsel concerning insurance could also apply to comments by the witness with respect to insurance. There is no attack made by the plaintiff in this appeal as to the adequacy of the verdict as to damages or any showing that the verdict was in fact an inadequate award. While the plaintiff raises the refusal of the judge to permit counsel to go into the amount of insurance coverage as error, the matter is one that is peculiarly within the discretion of the trial court because it concerns the limits of cross-examination. *Earley v. Winn* (1906), 129 Wis. 291, 109 N. W. 633. The trial court had to weigh the effect of

[3] *Caldwell v. Piggly Wiggly Madison Co.* (1966), 32 Wis. 2d 447, 145 N. W. 2d 745; *Roeske v. Schmitt* (1954), 266 Wis. 557, 64 N. W. 2d 394; *Walker v. Pomush* (1931), 206 Wis. 45, 238 N. W. 859; *Grandhagen v. Grandhagen* (1929), 199 Wis. 315, 225 N. W. 935; *Kellner v. Christiansen* (1919), 169 Wis. 390, 172 N. W. 796.

permitting the amount of the defendant's coverage to be admitted in evidence, ". . . otherwise admissible evidence can still be excluded in the discretion of the trial judge if its harmful effects on the legal process outweigh its probative value." *Boller v. Cofrances* (1969), 42 Wis. 2d 170, 184, 166 N. W. 2d 129; *Whitty v. State* (1967), 34 Wis. 2d 278, 149 N. W. 2d 557. We conclude that the restriction under the facts in this case was within the court's discretionary powers.

There was ample credible evidence to support the jury's finding that the plaintiff was at least 57 percent negligent and there is nothing in the record to indicate that the refusal of the trial court to allow the amount of defendant's coverage to be admitted into evidence affected in any way the jury's finding as to the relative degrees of negligence of the plaintiff and defendant and we therefore find that in any event there was no prejudicial error in the exclusion of such testimony.

The next question is, did the court commit error in its instructions to the jury on the damage issue?

The court instructed the jury that:

"The sum named by you as damages must be limited to such amount which has been proved to your satisfaction by the proof required as to fairly and justly compensate Wilbur Nimmer for the damages resulting to him as a natural consequence of the negligent treatment of him by the defendant, Neil Purtell, if any such negligence is so found by you."

We find that such instruction was erroneous as a matter of law and therefore was properly raised in the motion for a new trial after verdict even though no objection was made at the time the instruction was given.

Sec. 895.045, Stats., states that in a personal injury action ". . . damages allowed shall be diminished in the proportion to the amount of negligence attributable to the person recovering." The damages allowed are to

correspond to 100 percent of the plaintiff's damages and then are to be reduced by the amount of negligence attributable to the person recovering. This court has so interpreted this provision. *Schnepf v. Rosenthal* (1972), 53 Wis. 2d 268, 193 N. W. 2d 32; *Engebrecht v. Bradley* (1933), 211 Wis. 1, 5, 247 N. W. 451. Therefore, the instruction to the jury to compute not all of the damages that the plaintiff suffered but only that portion caused by the defendant's negligence was error.

Where instructions are merely incomplete, it is the duty of counsel to object at the time the instruction was given; however, where the instructions are erroneous in misstating the law they are properly preserved by being used as a ground for a motion for a new trial, as was done here. *Savina v. Wisconsin Gas Co.* (1967), 36 Wis. 2d 694, 702, 154 N. W. 2d 237.

The error was not prejudicial. The erroneous instruction would have the effect of depressing the damage figure found by the jury from 100 percent to whatever percentage of the negligence the jury found attributable to the defendant, here, 43 percent. There is nothing in the record to indicate that this is what the jury did, but in any event this court has said:

"The rule is that where a jury has answered other questions so as to determine that there is no liability on the part of the defendant, which finding is supported by credible evidence, the denial of damages or granting of inadequate damages to the plaintiff does not necessarily show prejudice or render the verdict perverse." *Sell v. Milwaukee Automobile Ins. Co.* (1962), 17 Wis. 2d 510, 519, 520, 117 N. W. 2d 719.

This court has stated:

" 'Errors committed in the course of a trial will not operate to disturb a judgment on appeal unless it appears pretty clearly that had they not occurred, the result might probably have been more favorable to the party com-

plaining.'" *State v. Esser* (1962), 16 Wis. 2d 567, 599, 115 N. W. 2d 505.

This court has also said that the test is one of "probability, not possibility, requiring the entire evidence to show that had not the error occurred the result would probably have been different." *Lisowski v. Milwaukee Automobile Mut. Ins. Co.* (1962), 17 Wis. 2d 499, 504, 117 N. W. 2d 666. We are unable from a review of this record to find any such probability existing. We hold, therefore, that while the instruction as to damages was error, it was not prejudicial.

Another question is, did the trial court commit prejudicial error in admitting into evidence facts relating to the plaintiff's application for social security benefits?

On cross-examination the plaintiff was asked what percentage of disability he claimed and he stated he had not thought of a percentage. Defense counsel then asked him about his application for social security benefits and whether or not he had claimed total, permanent disability. The plaintiff recalled applying for such benefits but could not recall what percentage of disability he claimed. The trial court, over objection, permitted this line of questioning for impeachment purposes. The plaintiff claims this is impermissible impeachment on a collateral matter and, therefore, that the trial court was in error. We disagree.

The issue of percentage of disability was material to the whole issue of damages. As we have pointed out above, the trial court has great discretion in limiting or refusing to limit the scope of cross-examination. We find here no ground for a new trial. The plaintiff also contends that the trial court committed prejudicial error in failing to limit the defendant's counsel's final argument regarding plaintiff's application for social security benefits. The plaintiff claims that in the closing argument, the defense counsel referred to the plaintiff's

application for such benefits in terms of fraud and dishonesty. He claims to have objected to the line of argument but none was made a matter of record. The plaintiff did not move for a mistrial at that point and as this court said in *Frion v. Craig* (1957), 274 Wis. 550, 555, 80 N. W. 2d 808: "Such course of action is open to the obvious interpretation that he preferred to continue with the trial and take his chances with the outcome rather than move for a mistrial . . . ." *Kink v. Combs* (1965), 28 Wis. 2d 65, 72, 135 N. W. 2d 789. The law in Wisconsin is quite clear that it is necessary to make immediate objection and move for a mistrial if the issue is misconduct of counsel. *Sheldon v. Singer* (1973), 61 Wis. 2d 443, 450, 213 N. W. 2d 5. The only way that this court could therefore consider this alleged error is on its own motion in its discretion. But here there is nothing to exercise the discretion on; not only was the plaintiff's claimed objection not recorded, the entire closing argument was unrecorded. Counsel for the defendant denies using the term "fraud" and is quite correct on this appeal in asserting that with no record this court cannot determine whose recollection of what was said is correct. The rule in Wisconsin is that absent some showing somewhere in the record, the court cannot consider the alleged error. *Borowske v. Integrity Mut. Ins. Co.* (1963), 20 Wis. 2d 93, 98, 121 N. W. 2d 287.

*By the Court.*—Judgment affirmed.