KASIETA, Plaintiff in error, v. STATE, Defendant in error.

*No. State 31. Argued February 6, 1974.—Decided March 5, 1974.*
(Also reported in 215 N. W. 2d 412.)

For the plaintiff in error there were briefs and oral argument by *Howard B. Eisenberg,* state public defender.

For the defendant in error the cause was argued by *Thomas J. Balistreri,* assistant attorney general, with whom on the brief was *Robert W. Warren,* attorney general.

BEILFUSS, J. The defendant has raised several issues:

(1) Did the defendant cause the death of the deceased in view of her physical condition?

(2) Was the evidence sufficient to convince a reasonable jury that the defendant was guilty of second-degree murder? And to the extent the jury could exclude the hypothesis that the defendant committed the act in the heat of passion?

(3) Was the defendant denied his constitutional right of confrontation because the transcribed testimony of witnesses taken in previous proceedings was read to the jury?

(4) Was evidence of previous threats probative of second-degree murder?

(5) Should a new trial be granted in the interest of justice?

The defendant contends the state did not prove beyond reasonable doubt that he caused the death of Jacqueline. His counsel acknowledges the law to be:

"Responsibility for homicide attaches to one who accelerates the death of a person in poor physical condition, although the injury inflicted would not have killed a healthy person, and although the condition from which the victim was suffering would itself probably have been fatal. Accused's ignorance of the victim's poor condition is immaterial."

A doctor who examined the deceased Jacqueline testified, in part, as follows:

". . . this woman had some pneumonia as a result of irradiation and as a result of bacteremia and strep, but she also . . . had been drinking, probably had some medication in her . . . . And, I believe she was assaulted or beaten and she bled and because of her incapacitation for intoxication and what not, she was unable to cough this up or resist this blood. And, then with her decreased pulmonary reserve, because of the treatment in her system of the disease, this contributed to her rapid death."

The autopsy report gave the following cause of death:

"Postmortem examination revealed findings consistent with all of the above diagnoses. Death is attributed to bacteremia and hemorrhagic pneumonia in a person with treated Hodgkin's disease. Her demise is considered to have been aggravated by the trauma she sustained in the form of blunt injuries to the face resulting in a fractured nose and lacerations of the scalp, plus multiple facial areas of ecchymoses. Anoxia, secondary to mechanical closure of the airway passage, as a mechanism of death, cannot be excluded on the basis of the findings, however, there are sufficient morphological findings (elevated blood alcohol level, pneumonia, granulocytic hyperplasia of the marrow and non-necrotizing hepatitis) to indicate

that the person was seriously ill, both as a complication of her neoplastic disease process (Hodgkin's disease) and her social habits (elevated blood alcohol level) to be more vulnerable than an otherwise healthy individual to stress, which in this case was manifested in the form of bodily trauma to the facial area by blunt physical forces."

The pathologist testified "that's most improbable" when asked if Jacqueline would have died if she had not been struck in the nose. On cross-examination he stated, "It's a possibility." A mere possibility is not sufficient to create a reasonable doubt as a matter of law. " '. . . if more than one reasonable inference can be drawn from the evidence, the inference which supports the finding is the one that must be adopted. . . .' " *Taylor v. State* (1972), 55 Wis. 2d 168, 176, 197 N. W. 2d 805.

In our opinion the evidence is sufficient to prove beyond reasonable doubt that the act of the defendant caused the death of Jacqueline.

The defendant next contends the evidence was not sufficient to prove the defendant guilty of second-degree murder and that at most it was manslaughter.

Sec. 940.02, Stats., provides:

"**Second-degree murder.** Whoever causes the death of another human being by conduct imminently dangerous to another and evincing a depraved mind, regardless of human life, may be imprisoned not less than 5 nor more than 25 years."

As previously discussed, the fact that the defendant caused Jacqueline's death was established.

Defendant claims that his conduct, *i.e.*, striking someone in the nose with his fist, is not imminently dangerous. However, the record establishes that defendant knew of the medical treatments that Jacqueline had been receiving and he knew that she had Hodgkin's disease. Defendant was in his late twenties at the time of the crime. He had played football and baseball in high school, had taken

judo lessons and was actively racing stockcars and snowmobiles. Defendant was 5′ 10″ and weighed about 180 pounds. The deceased had multiple bruises on her face, a superficial wound over her left eye, a wound of over one inch long on her scalp, and a fractured nose. From this a jury could reasonably infer that a beating of this nature inflicted by a man of the defendant's characteristics was conduct imminently dangerous to another.

We also conclude the jury could find that his conduct evinced a depraved mind regardless of human life. Knowing Jacqueline's physical condition, the defendant's conduct did demonstrate an utter lack of concern for the life and safety of Jacqueline. The evidence is sufficient to support a belief that the defendant's acts were done in a malicious rage, stemming from ill-will, hatred and jealously and done with an evil intent [2] and a disregard for human life.

The defendant argues that, at most, such conduct should be considered manslaughter. He further argues that such conduct did not evince a depraved mind but rather a crime committed in the heat of passion.

In *State v. Hoyt* (1963), 21 Wis. 2d 310, 124 N. W. 2d 47, rehearing (1964), 21 Wis. 2d 284, 128 N. W. 2d 645, this court drew the distinction between second-degree murder and manslaughter at pages 317m, 317n:

"By definition, second-degree murder is an unintentional killing. The overt behavior which produces death must be characterized as conduct evincing a depraved mind. A 'depraved mind' has been defined in these terms:

" 'The phrase "a depraved mind" as used in defining murder in the second degree carries the suggestion of an induced or self-created condition of mind, and is to be distinguished from a state of mind generally described as insanity or feeblemindedness resulting from some disease or defect existing from birth or early childhood.'

---

[2] See *Raneri v. State* (Fla. Dist. Court 1971), 255 So. 2d 291, 294.

"The statutory definition of manslaughter which is relevant here is: 'Whoever causes the death of another human being . . . without intent to kill and while in the heat of passion; . . .' On its face, the statute treats manslaughter as an unintentional killing.

"Thus, both manslaughter and second-degree murder assume that the killing was not purposive. The essential difference between the two degrees of homicide does not lie in the nature of the course of conduct, but rather in the state of mind with which the conduct is carried out. Criminal homicide constitutes manslaughter when a homicide which would otherwise be second-degree murder is committed under the influence of extreme emotional disturbance for which there is a reasonable explanation or excuse. The reasonableness of such explanation or excuse shall be determined from the viewpoint of a person in the actor's situation under the circumstances as he believes them to be."

And, at pages 290, 291 (rehearing) :

" 'That which will constitute "the heat of passion" which will reduce what would otherwise be murder to manslaughter "is such mental disturbance, caused by reasonable, adequate provocation, as would ordinarily so overcome and dominate or suspend the exercise of the judgment of an ordinary man as to render his mind for the time being deaf to the voice of reason; make him incapable of forming and executing that distinct intent to take human life essential to murder in the first degree; and to cause him, uncontrollably, to act from impelling force of the disturbing cause rather than from any real wickedness of heart or cruelty or recklessness of disposition." *State v. Stortecky* (1956), 273 Wis. 362, 372, 77 N. W. (2d) 721. It has been said that " 'the provocation, in order to be sufficient in law, must be such as, naturally and instantly, to produce in the minds of persons, ordinarily constituted, the highest degree of exasperation, rage, anger, sudden resentment, or terror.' " 21 Am. & Eng. Ency. of Law (2d ed.), p. 177, quoted in *Johnson v. State* (1906), 129 Wis. 146, 159, 108 N. W. 55.'

"We have recently said:

" 'Thus, with respect to provocation, the test applied is not the subjective one of whether it was sufficient

to produce in defendant such passion as to cause him to kill without intent to do so. Rather it is the objective one of whether the provocation would have caused such state of mind in persons ordinarily constituted.' "

The fact that the jury could have returned a manslaughter verdict by its belief that the defendant acted in the "heat of passion" does not legally require that it do so. The jury finding of second-degree murder is supported by ample credible evidence. The fact that a different but reasonable view of the evidence would have supported a manslaugher verdict does not invalidate the finding of second-degree murder.

The defendant contends it was error to allow the depositions or prior testimony of DeGidio and two doctors to be read to the jury because of his constitutional right of confrontation.

"Although both the state and the federal constitutions guarantee the accused the right to confront the witnesses against him, the rule has universally been applied that when a witness is not available for trial and when the defendant has had a prior opportunity to cross-examine that witness, former testimony may be introduced without violating either the constitutional mandates or the hearsay rule of evidence. This was made clear by this court in *Gaertner v. State* [(1967), 35 Wis. 2d 159, 167, 150 N. W. 2d 370]." *State v. Lindsey* (1972), 53 Wis. 2d 759, 763, 764, 193 N. W. 2d 699.

Sec. 885.31, Stats., provides:

"**Testimony of deceased or absent witness.** The testimony of a deceased witness, or a witness absent from the state, taken in any action or proceeding (except in a default action or proceeding where service of process was obtained by publication), shall be admissible in evidence in any retrial, or in any other action or proceeding where the party against whom it is offered shall have had an opportunity to cross-examine said witness, and where the issue upon which it is offered is substantially the same as the one upon which it was taken."

The trial court allowed the district attorney to read the testimony of DeGidio given at the first trial. The district attorney had timely contacted DeGidio by telephone at his place of business in Minneapolis and De Gidio refused to return to Hurley to testify. The district attorney then attempted to secure DeGidio's presence under the Uniform Act for the Extradition of Witnesses in Criminal Actions (sec. 976.02, Stats.). The sheriff of Hennepin county, Minnesota, tried to serve DeGidio with appropriate process three times but was unable to locate him.

The court permitted the prosecution to read to the jury the testimony of Dr. Lester Medford given at the preliminary examination. At the time of the preliminary examination Dr. Medford lived in Bessemer, Michigan, a few miles from Hurley, Wisconsin, and at the time of trial he lived in San Bernardino, California. Dr. Medford, upon being requested by letter and telephone to return to Hurley to testify, refused upon the advice of his California attorney that he was not required to do so. No attempt was made to secure his presence under the uniform act.

The district attorney also read the testimony of Dr. William Strutton, a pathologist. At the time of the preliminary Dr. Strutton lived in Duluth, Minnesota, and at the time of trial in Hampton Bays, New York. Dr. Strutton advised the district attorney that his schedule would not permit him to appear at Hurley as a witness at the trial. Again, no attempt was made to secure his presence under the uniform act.

The requirements of the absent witness statute (sec. 885.31, Stats., *supra*) have been complied with. As to all three witnesses, the defendant did confront them and they were cross-examined by his counsel.

In *State v. La Fernier* (1969), 44 Wis. 2d 440, 442, 446, 171 N. W. 2d 408, we held that a deposition or

prior testimony could be received in evidence, however the party offering it must do more than merely show the witness was absent from the state. The proponent must show that he exercised due diligence and good faith in an effort to secure his attendance.

DeGidio and the two doctors were obviously important witnesses and their absence should not be excused and their prior testimony accepted without a showing of a good-faith effort to secure their attendance.

We believe the facts stated above reveal the district attorney made a diligent good-faith effort to secure the attendance of the witness DeGidio. The fact that the Minnesota sheriff was unable to serve DeGidio with process was beyond the control or authority of the district attorney.

Likewise, knowing the general reluctance of many medical witnesses to testify and the very substantial distance they were from Hurley at the time of this third trial excused the district attorney from proceeding under the Uniform Extradition Act. The district attorney did request their attendance by letter and by telephone. Under circumstances here we conclude he made a good-faith effort to secure their attendance.

As to all three witnesses, the trial court did not err nor abuse its discretion in allowing the district attorney to use the prior depositions of the absent witnesses.

The defendant further contends it was prejudicial error to allow acquaintances of both the defendant and Jacqueline to testify as to the abuse and threats to Jacqueline made by the defendant prior to the incident in question and as to the physical abuse to others he suspected of wrongfully associating with her.

The trial court, in its ruling on the objection to this testimony, clearly indicated that the evidence was being admitted not to establish premeditation but for whatever relevancy it might have on the question of "heat

of passion." When this evidence was received the issue of manslaughter was still before the jury and the evidence was relevant and probative as to that issue. We find no error in receiving this testimony.

We are of the further opinion that the evidence of prior threats and abuse was also relevant and probative of second-degree murder despite the authorities cited by the defendant. It was probative of his prolonged jealousy and state of mind; it was also probative of the nature of his physical attack on Jacqueline and probative to negate his claim of the accidental striking or misadventure.

The defendant finally urges that he should be given a new trial in the interest of justice. We find no ineffectiveness of counsel in not seeking a change of venue nor in any other aspect of his representation of the defendant. No prejudicial errors exist and the defendant was not denied a fair trial. Three juries have heard this case and three juries have returned verdicts of guilty as to second-degree murder. It is not probable a fourth jury would do less. This is not a case where, in our discretion, a new trial should be ordered.

*By the Court.*—Judgment and order affirmed.