VIRGIL, Plaintiff in error, v. STATE, Defendant in error.

*No. 76–244–CR.  Argued April 3, 1978.—Decided June 30, 1978.*
(Also reported in 267 N.W.2d 852.)

For the plaintiff in error the cause was argued by *Melvin F. Greenberg,* assistant state public defender, with whom on the briefs was *Howard B. Eisenberg,* state public defender.

For the defendant in error there was a brief by *Bronson C. La Follette,* attorney general, and *John M. Schmolesky,* assistant attorney general, and oral argument by *Pamela Magee-Heilprin,* assistant attorney general.

HEFFERNAN, J. After a jury trial, the defendant, Morris Virgil, on September 17, 1975, was found guilty of second-degree murder, party to a crime, in violation of sec. 940.02 and sec. 939.05, Stats.; robbery, party to a crime, in violation of sec. 943.32(1)(a) and sec. 939.05; and burglary-battery, party to a crime, in violation of sec. 943.10(1)(a) and (2)(d) and sec. 939.05. On these respective charges, Virgil was sentenced to twenty-four years, five months; nine years, five months; and sixteen years, two months, all sentences to run consecutively. Subsequently, the defendant moved the court to set aside the conviction, order a new trial, and modify the sentence. These motions were denied by an order of the

circuit court on May 12, 1976. Writs of error have been issued to review the conviction and the denial of the post-conviction motions.

The crimes consisted of the murder of Elfrieda Lindner, an eighty-two-year-old woman, the burglary of her home, the battery committed upon her, and robbery by force for the purpose of taking her property.

The principal testimony in respect to the crime was given by David Guyton, who was a participant in the events that occurred on December 16, 1974. At the time of the crime, Guyton was fifteen years old. Because he was of an age at which he could not be charged with an adult crime, the district attorney offered him immunity in exchange for his cooperation with the state's prosecution of the other defendants, who were tried in an adult court. Immunity was granted to Guyton by the court.

Guyton testified that, on the evening of December 16, 1974, he was in the company of Clarence Eiland and the defendant Morris Virgil in the vicinity of 29th Street and Capitol Drive in the City of Milwaukee. He testified that they talked about how they could get some money. It was decided that they would attempt an entry into a residence occupied, as it was later determined, by Elfrieda Lindner. It was agreed that Guyton was to walk upstairs to a porch and, when the door was opened, he would stamp twice as a signal for Virgil and Eiland to assist him in the break-in. Guyton testified that, when he got upstairs, he asked Elfrieda Lindner if she wished to buy any Christmas cards. She replied, "No," and at that point, Guyton signalled the other two, and all three of them forced their way into the apartment.

Guyton testified that he grabbed Elfrieda Lindner and held his hand over her mouth, and all three of them struck her and she was pulled to the floor. Guyton testified that the defendant sat on the victim, and that the defendant told Eiland to get something so her hands could be tied.

After her hands were tied, she was still making noise, so Guyton and the defendant Virgil continued to hit her. The victim continued to make noise; and at that point, according to Guyton, Virgil told Eiland to get something to gag the woman. Eiland returned with a heavy towel, and Guyton testified that he gagged her with it, that at the time she was lying face down, and that he lifted her head, slipped the cloth over it, and knotted it at the back of her head. He testified that he did not look to see whether the victim's nose and mouth were completely covered. Subsequent testimony, however, showed that the towel was bound tightly over her face and mouth.

All three of the persons then went through the house looking for valuables. While this search was going on, the defendant and Eiland noted that the victim had quit moaning, and they informed Guyton that they thought she was dead. Guyton looked at her, saw that her eyes were open, but stated that he thought she was just in a state of shock. All three of them then went through the house for the purpose of wiping off any fingerprints that they might have left. Subsequently, they split the $12 which they found on the premises.

Elfrieda Lindner's corpse was discovered the next day by a friend who became worried about her when his daily telephone call to her was not answered. The police were immediately called. On their arrival, they found the towel so tightly knotted over Elfrieda Lindner's face and mouth that it was difficult to pull it down. The police officer observed that her face was badly bruised. When she was rolled onto her side, a brown mucous substance came out of her mouth and nose.

An autopsy was performed by Dr. Joseph Kuzma, a medical examiner for Milwaukee county. He testified that Elfrieda Lindner was an elderly lady and that he had been informed that she was eighty-two years old. He observed eight bruises and five abrasions on her

body, and an internal examination revealed an area of fresh blood on the surface of the brain which he said was caused by a severe blow to the head. While he concluded that the brain injury might well have caused death later, it was not the actual cause of death, that death was caused by suffocation by the gag. He said the gag prevented air from entering the lungs and that the exclusion of air resulted in the aspiration of fluids into the lungs. He testified that the fluid observed in the victim's mouth and nose was vomitus, that the covering of her nose and mouth by the gag prevented its expulsion, and that this fluid ran down into the windpipe and the lungs.

The first issue raised by the defendant is the contention that the evidence was insufficient to support a conviction for second-degree murder. Second-degree murder is defined in sec. 940.02, Stats., as follows:

"940.02  Second-degree murder. Whoever causes the death of another human being by conduct imminently dangerous to another and evincing a depraved mind, regardless of human life, may be imprisoned not less than 5 nor more than 25 years."

There are three elements to the crime of second-degree murder:

"(1)  the accused's conduct was imminently dangerous to another, (2) the accused's conduct was of such a character that it evinced a depraved mind, regardless of life, and (3) the accused's conduct, imminently dangerous to another and evincing a depraved mind, regardless of life, caused the death of the victim." *Turner v. State,* 76 Wis.2d 1, 10, 250 N.W.2d 706 (1977).

In the recent case of *Seidler v. State,* 64 Wis.2d 456, 219 N.W.2d 320, 67 A.L.R.3d 890 (1974), this court undertook an extensive analysis of the elements of the crime of second-degree murder. In respect to the first element of second-degree murder, reliance was placed

upon the language of *Hogan v. State,* 30 Wis. 428 (1872), and a subsequent case of *Hogan v. State,* 36 Wis. 226 (1874). Those cases pointed out that the act which causes death must be inherently dangerous to life, although there is no actual intent to commit homicide. Chief Justice Ryan, in the second *Hogan* case, stated:

"In our view of murder in the second degree, it goes in any case upon constructive intent to kill, intent imputed by law where there is no actual intent to kill." (at 249)

These definitions were expressly accepted in *Seidler* as the appropriate statement of the present law.

In *Seidler,* itself, the death resulted when an irate babysitter threw a child in the general direction of a bed. The child's abdomen struck the metal frame of the bed, and death resulted from internal bleeding. We held that this conduct, although culpable and reprehensible, was not of the type that was inherently dangerous to life. It did not fit the definition of *Hogan v. State* that there be a constructive or implied intent to cause death. In *Seidler,* at 463, we discussed cases illustrative of conduct which was imminently dangerous in that it was of a nature that demonstrated a constructive intent to cause death.

Most of the cases set forth in *Seidler* are analogous on the facts to the seminal case of *Hogan,* where the striking of the victim's face with the sharp edge of an axe was considered to be evidence of conduct imminently and inherently dangerous to the life of another.

One of the cases, however, which was relied upon in *Seidler* was *Kasieta v. State,* 62 Wis.2d 564, 215 N.W.2d 412 (1974), where we found a conviction of second-degree murder sustained by the evidence where the defendant, knowing that his wife suffered from Hodgkins disease, nevertheless beat her with his fists.

Subsequent to *Seidler,* we decided the case of *State v. Turner, supra.* Therein, we held the crime of second-degree murder proved by the evidence, where it was established that the defendant, a twenty-four-year-old male, forcibly committed sodomy with a nine-year-old girl, four feet five inches in height and weighing 63 pounds. In that case, the cause of death was found to be asphyxiation secondary to a cardio-pulmonary arrest occasioned by the primary shock which resulted from the forced sodomy on a small child.

We find these two cases substantially similar to the evidence in the instant case. In the *Turner* case and in the *Kasieta* case, the defendant was implicitly or explicitly aware of the physical attributes or deficiencies of the victim which would make the conduct imminently dangerous and life threatening to the particular victim, even though such conduct may not have been likely to produce death in a healthy adult person. We find the same situation true in the instant case.

The testimony of Guyton showed that he tied a cloth towel tightly over the nose and mouth of a person that he characterized as "old." The medical examiner testified that the gag itself prevented the inhalation and expiration of air. While there is nothing to show that Guyton and the defendant, as a party to the crime, intended to cause the death of this elderly lady, what in fact was done was as dangerous and death causing as any other form of mechanical or manual asphyxiation. While the time of death was no doubt accelerated by the debilities of old age, the imminently dangerous conduct of the defendant and his co-participants in the crime might, if the medical examiner's testimony is to be believed, have caused death in any victim. Nevertheless, the implicit intent to cause death is strengthened by the fact that the perpetrators

knew that they were dealing with an aged victim. As we said in *Turner v. State:*

"This court has found the relative physical characteristics of the victim and assailant to be factors which may be considered in determining whether conduct is imminently dangerous." (at 13)

An additional question to be considered is whether the conduct was the product of a depraved mind. We have, in the recent case of *Wagner v. State,* 76 Wis.2d 30, 45, 250 N.W.2d 331 (1977), reaffirmed our approval of the definition of conduct evincing a depraved mind set forth in Wis. JI—Criminal, Part II, 1110, which states:

" '. . . The depravity of mind referred to in second degree murder exists when the conduct causing death demonstrated an utter lack of concern for the life and safety of another and for which conduct there is no justification or excuse. . . .' "

In *Wagner,* we quoted with approval previous statements in respect to the nature of the term, "depraved mind." Pertinent to this case are the following statements originating in *State v. Weso,* 60 Wis.2d 404, 410, 210 N.W.2d 442 (1973), and repeated in *Wagner v. State, supra,* at 45–6:

" 'A depraved mind is one having an inherent deficiency or moral sense and rectitude. Otherwise it would not prompt an act which in its nature is imminently dangerous to the safety of another. The element of the disregard for life likewise calls for a state of mind which has no regard for the moral or social duties of a human being.

" 'A depraved mind must be indifferent to the life of others. Such negative attitude is not found in the mind of a normal, reasonable person. The desire to live and the recognition others desire to live and have a right to life is innate in the mind of a normal person. Mere negligence alone is not sufficient. . . .

" '. . .

" 'To constitute a depraved mind, more than a high degree of negligence or recklessness must exist. The mind must not only disregard the safety of another but be devoid of regard for the life of another . . . A depraved mind lacks a moral sense, an appreciation of life, is unreasonable and lacks judgment. A depraved mind has a general intent to do the acts and the consciousness of the nature of the acts and possible result but lacks the specific intent to do the harm. . . .' "

That the conduct of Guyton, Eiland, and the defendant, Virgil, evinced a depraved mind is shown by the testimony of Guyton. Guyton testified that after Elfrieda Lindner was brought to the floor by the combined attack of all three of the assailants, Virgil and Guyton held her down and tied her hands behind her. During this period, Guyton said, Elfrieda Lindner was moaning and making noises. He stated that, whenever she made a noise, he and the defendant Virgil would hit her. It was the defendant Virgil who instructed Eiland to get a gag to silence her moaning. During this entire period, Guyton stated, he continued to hit the elderly woman.

Counsel for the defendant Virgil on cross-examination asked:

"Q   Were you trying to injure her?
"A   I didn't really care at the time, you know.
"Q   What do you mean you didn't care?
"A   I didn't care whether I injured her or not.
"Q   Were you trying or weren't you?
"A   Well, she wouldn't shut up, so I guess I was trying to injure, keep her from making noises."

After the victim was gagged, Guyton, Eiland, and the defendant Virgil commenced ransacking the apartment looking for valuables. Defense counsel asked:

"Q   Was she still making noise at the time?
"A   She was still moaning, you know.
"Q   And how long did this go on, you know?
"A   Let me see. No, I ain't got no—I don't know really what time—how long she—you know—was moaning. We weren't paying no attention to her, just that."

Moreover, the testimony of Guyton expressly acknow-
ledged that, when he last saw Elfrieda Lindner before
leaving the apartment, the towel or gag completely
covered her nose and mouth.

This testimony clearly evidences conduct demonstrative
of a depraved mind. Guyton stated that he did not care
whether he injured her or not and that he was trying to
injure her to keep her from making noises. He paid no
attention to her when she continued to moan after the
gag had been placed over her nose and mouth. He was
entirely indifferent to the life or safety of Elfrieda
Lindner. Not only did his general conduct create a situa-
tion imminently dangerous to the life of Elfrieda Lind-
ner, but, in addition, he consciously attempted to
silence her by blows to the head and by placing the gag
over her mouth and nose. This was more than reckless
or negligent conduct. It was conduct which admittedly
disregarded the safety of Elfrieda Lindner and was de-
void of any regard for her life.

The conduct evidenced, at that time, a complete lack of
moral sense or appreciation of the life of another.

The language quoted above from *Wagner* and *Weso* is
appropriate to the facts of the instant case:

" 'A depraved mind has a general intent to do the acts
and the consciousness of the nature of the acts and pos-
sible result but lacks the specific intent to do the harm.' "
*Wagner,* at 46.

The defendant and his co-participants in the crime con-
tinued to beat the defenseless and prone victim and in-
tentionally placed a heavy gag over her nose and mouth,
which created the high probability that death by asphyx-
iation would follow. Unlike the situation in *Wagner v.
State,* where the defendant, although acting in a danger-
ous fashion, attempted to avoid the impact with the vic-
tim, here the participants in the crime, including the de-

fendant, callously ignored Elfrieda Lindner's moans after she was gagged.

Each of the participants, including the defendant Virgil, engaged in conduct which evinced a depraved mind regardless of life. The facts adduced at trial were appropriate to the charge of second-degree murder, and the evidence was sufficient to sustain a conviction on that charge.

Error is also urged because Guyton's testimony on direct examination, as a witness for the state implicating the defendant Virgil, was allowed to be fortified by substantially reading into the record prior statements. It was asserted that his prior statements, given to the police, were inconsistent with his in-court testimony. We have carefully examined those prior statements and compared them with his testimony at trial when he was questioned on direct by the prosecutor. We conclude that the inconsistencies were minor and irrelevant. It is apparent from reading the record that Guyton had been carefully coached by the prosecution to elicit the statement from him that his first statement given to the police was inconsistent with his trial testimony. It is equally apparent that setting the stage for this alleged inconsistency was devised for the purpose of bringing in the statement of Guyton not once but three times. Moreover, the out-of-court statement given to the police on March 1, 1975, was admittedly a consistent statement, and yet numerous references to it were permitted in the course of the evidence.

The statutes provide circumstances under which prior statements of a witness may be admitted into evidence. Sec. 908.01 (4) (a) (1), Stats., provides:

"(4) Statements Which Are Not Hearsay. A statement is not hearsay if:

"(a) *Prior statement by witness.* The declarant testifies at the trial or hearing and is subject to cross-ex-

amination concerning the statement, and the statement is:

"1.  Inconsistent with his testimony. . . ."

While we consider the introduction of the out-of-court statement symptomatic of an overly zealous prosecution, we cannot, under the circumstances, denominate it as prejudicial error. It was admitted without objection by the defense counsel and, although its effect was to restate and reemphasize the Guyton testimony implicating the defendant, the evidence was cumulative and added nothing to the state's case. Certainly, however, an objection could have been appropriately made by the defense counsel. As we indicated in *State v. Lenarchick*, 74 Wis.2d 425, 436, 247 N.W.2d 80 (1976), where an objection is made to an out-of-court statement on the grounds that it is not indeed inconsistent and therefore hearsay, it is the obligation of the judge to examine the out-of-court statement to determine whether any relevant inconsistencies are apparent which would make the introduction of otherwise cumulative testimony necessary to test the credibility or the recollection of the witness.

In the instant case, as stated above, the prosecutor elicited the statement from Guyton that he had given an inconsistent statement to the police. The hearsay rules, however, are not to be circumvented by such a self-serving statement elicited by one of the parties. It remains the duty of the opposing counsel to test the statement to determine there is indeed a relevant inconsistency, and it is the obligation of the trial judge to make the appropriate ruling on the basis of his perception of the statement after an objection is made. However, no objection was raised, and we decline in the circumstances to denominate the receipt of this evidence as error.

Additional gratuitous and improper evidence was admitted without objection when an assistant district at-

torney was called to testify that David Guyton had testified at the preliminary hearing in the case of Morris Virgil and had stated that Virgil was one of the participants in the murder of Elfrieda Lindner. This evidence, again, was improper. It had for its purpose the recounting of the assertion of Guyton in still another form in respect to the culpability of Virgil. Guyton was present in court and had testified to the same effect, and no attack at any time was made upon his credibility. Any effort to bolster his in-court testimony by the showing of prior consistent statements was inappropriate, and such testimony was inadmissible and not subject to any of the exceptions to the hearsay rule.

The same assistant district attorney also was permitted to testify in respect to a plea bargain made with Guyton and to state the reasons why the state offered such a bargain. The assistant district attorney stated that, because Guyton was fifteen years old at the time of the crime, he was not subject to transfer to an adult court for prosecution and that, were he to be prosecuted as a juvenile, he could only be held in custody until his eighteenth birthday. Under those circumstances, the assistant district attorney explained that it was appropriate to grant him immunity in exchange for his testimony that would facilitate the prosecution of the other participants in the crime.

We conclude that the testimony of the assistant district attorney in respect to Guyton's plea bargain and his grant of immunity was improper and should have been excluded had an appropriate objection been made.

On this appeal, both parties rely on the language of *United States v. Thaggard*, 477 F.2d 626 (5th Cir. 1973), cert. denied 414 U.S. 1064. That case involved very similar testimony at trial by a member of the United States Attorney's staff. The court therein stated, at 633,

"Quite obviously, this line of testimony had no business in the trial. Neither side should have been allowed to drag it in."[1] The court went on, however, to say:

"What the United States Attorney did about the prosecution of other defendants or conspirators in this case, and his motives for it, was solely within his discretion, certainly insofar as these or other defendants were concerned, United States v. Cox, 5 Cir., 1965, 342 F.2d 167, cert. denied 381 U.S. 935, 85 S. Ct. 1767, 14 L. Ed.2d 700. Nevertheless, the testimony of the United States Attorney merely stated his reasons for not prosecuting the county sheriff. It contained no remarks directed toward the guilt or innocence of the defendants at the bar. Indeed, Mr. DeMent could have personally known nothing about that, except that he knew of Thaggard's visit to his office which admittedly took place before the alleged criminal activities began. There is nothing in this skirmish which would justify a reversal."

We are satisfied that, although this testimony was objectionable and could have been excluded had there been timely action by the defense counsel, it did not so affect the substantial rights of the defendant as to amount to plain error under the Rules of Evidence (sec. 901.03(4), Stats.). We nevertheless, in respect to the above quotation, express our disquietude that the state in its brief omitted the portion of the quotation from *Thaggard* which demonstrated that, in the opinion of the United States Court of Appeals, this type of testimony was inadmissible. The state's omission was brought to our attention by the brief of the Public Defender. To the extent that the Court of Appeals' pronouncement on the propriety of this type of evidence was omitted, we consider the use of the quotation by the state as being misleading to the court.

Additionally, error is predicated on the fact that Clarence Eiland, a co-participant in the murder, was

---

[1] This portion of *Thaggard* was omitted from the state's brief.

called to the stand to testify in respect to the disposition of charges against him. In response to questions of the prosecutor, he was asked whether he pleaded guilty to the charge of murdering Elfrieda Lindner, whether he was sentenced as a result of that plea, and the term of any sentence imposed. He responded that he pleaded guilty, and that he was sentenced to a term of thirty-four years.

Prior to these statements by Eiland, Eiland stated that he refused to answer any questions in respect to the event that occurred on the night of December 16, 1974. Because of his refusal to answer, Eiland, at the request of the district attorney, was found guilty of contempt and sentenced to thirty days imprisonment. After the finding of contempt and after the witness refused to purge himself of the contempt by then answering, the district attorney, in the presence of the jury in open court, asked the questions in respect to the guilty plea, the sentence, and its term. Under the circumstances, this testimony was improper and, had it been objected to, it would no doubt appropriately have been excluded by the trial judge.

The introduction of a co-defendant's guilty plea is permissible only when its use is limited to a proper evidentiary purpose, such as the impeachment of trial testimony or to reflect on the witness' credibility. *United States v. King*, 505 F.2d 602, 607 (5th Cir. 1974). While such evidence would have been appropriate to attack the credibility of a witness who had testified or was in the course of testifying, it was completely inappropriate in the instant case, for, prior to the prosecutor's eliciting these answers, the witness had already stated that he would not talk. Although the purpose of introducing this evidence was patently improper, no objection was made to the testimony and no instruction limiting its evidentiary value was requested by the defense counsel. More-

over, the record shows that Eiland's conduct on the stand was bizarre and uncooperative. The record shows that he was smirking during the course of the testimony and waving at spectators in the courtroom. In addition to the fact that the prejudice appears negligible, it is reasonable to conclude that defense counsel, as a tactical matter, may have determined not to emphasize the significance of Eiland's limited testimony or his guilty plea by posing an express objection in the presence of the jury.

We are satisfied that the error is not one to be denominated as plain error under sec. 901.03(4) of the Rules of Evidence in that no substantial rights of the defendant were affected.

After Eiland recounted the fact that he had pleaded guilty and was sentenced for his participation in the murder of Elfrieda Lindner and then refused any further testimony, Detective Halvorson was called to the stand. He testified that Eiland gave him a statement detailing the murder of Elfrieda Lindner. He recounted what Eiland told him in an oral statement taken on February 27, 1975, and two written statements elicited from Eiland at other times. These statements had the effect of linking Virgil with the crime and of actually finding and taking the money from the premises of Elfrieda Lindner. In each of the written statements and in the oral statement recounted by Detective Halvorson, Virgil was named as being present and participating in the events of December 16, 1974.

In explicably, these out-of-court utterances were permitted to come in without objection. It is equally inexplicable that the state, having produced convincing evidence of Virgil's guilt by Guyton's direct testimony at trial, would jeopardize its prosecution by introducing evidence of questionable admissibility and which, in addition, violated a fundamental constitutional precept governing a fair trial.

It is clear that Eiland's out-of-court statements to the police were hearsay, for their purpose only could be to prove the truth of the matters asserted therein—Virgil's complicity in the crime.

Nevertheless, hearsay is competent evidence and may be admissible unless objected to. In addition, an out-of-court statement, even though hearsay, may be admissible if it fits within a recognized exception to the hearsay rule.

Still another level of inquiry must, however, be delved into where hearsay, admissible as an exception to the hearsay rule, arguably violates the confrontation clauses of the United States and Wisconsin Constitutions.

We are satisfied that under the Rules of Evidence, if only the question of hearsay were implicated, Eiland's out-of-court statements would be admissible. It is apparent that the statements given to the police by Eiland were contrary to his interest in that they tended to make him subject to criminal liability at the time the statement or declaration was made. As such, the statements were admissible under sec. 908.045 of the Rules of Evidence. That rule provides:

"908.045 Hearsay exceptions; declarant unavailable. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

". . . .

"(4) Statement Against Interest. A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability or to render invalid a claim by the declarant against another or to make the declarant an object of hatred, ridicule, or disgrace, that a reasonable person in the declarant's position would not have made the state-

ment unless the person believed it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborated."

The confrontation clause of the Constitution of the United States and the parallel provision of the Constitution of the State of Wisconsin may require, in some circumstances, however, that evidence be excluded although the hearsay rule is satisfied. The Sixth Amendment to the United States Constitution, made applicable to the states by *Pointer v. Texas*, 380 U.S. 400 (1965), requires that: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him. . . ." Art. I, sec. 7, of the Wisconsin Constitution contains language of similar import, that a defendant has the right "to meet the witnesses face to face."

This court reviewed the requirements of the state and federal confrontation clauses in *State v. Lenarchick*, 74 Wis.2d 425, 247 N.W.2d 80 (1976). That case established that the hearsay rule and its exceptions are not necessarily congruent with the strictures of the confrontation clause in the sense that a statement may be unobjectionable under an exception to the hearsay rule and still be constitutionally impermissible under the confrontation clause. It was recognized therein that, although the confrontation clause—and its equivalent under the Wisconsin Constitution—has strong overtones of due process in the sense that the state must use due diligence in securing the "availability of witnesses," yet the cornerstone of the right of confrontation is not merely that the state has produced a witness for eyeball-to-eyeball presentment to the defendant, but rather that the right of confrontation is satisfied in a constitutional sense only where a meaningful cross-examination of the witness who actually uttered the assertions is possible. We said in *Lenarchick*:

"[T]he right to a meaningful cross-examination remains a major criterion of constitutional confrontation.

It is difficult or impossible, however, to assert that it is the *sine qua non,* in light of the statements of the United States Supreme Court that dying declarations satisfy that requirement.

"Yet, as Wigmore, who conceived of the confrontation clause as merely a codification of the common-law hearsay rule, said, 'The main and essential purpose of confrontation is *to secure for the opponent the opportunity of cross-examination.'* Wigmore, *supra,* sec. 1395, p. 150; see also, N.Y.U.L. Rev., *supra,* p. 656.

"It would appear, therefore, of doubtful constitutional propriety to conclude that mere availability or presence of a witness, which would satisfy the due-process requirement of being available, would satisfy the purpose behind the confrontation rule, if in fact the witness could not be cross-examined.

"Despite the incongruousness of permitting dying declarations as satisfying the confrontation clause, an opportunity for a cross-examination that has some meaning in the fact-finding process is necessary. Where, for example, a witness has clothed himself with the cloak of the fifth amendment, the United States Supreme Court has held that a meaningful confrontation is denied. [citing *Douglas v. Alabama,* 380 U.S. 415 (1965)]." At 441–42.

In *Lenarchick* we held that there was no violation of the right of confrontation where the witness was physically available and did not object to cross-examination, but rather displayed a selective loss of memory, and where the circumstances indicated that counsel carefully avoided cross-examination on issues that were potentially harmful to the defendant.

The instant case is, however, quite different and falls within the teachings of *Douglas v. Alabama,* 380 U.S. 415 (1965). In that case the defendant's accomplice, who had been tried separately, was called as a witness but invoked his privilege against self-incrimination. The prosecutor produced a confession signed by that accomplice and, in the guise of cross-examination to refresh recollection, read from the document, pausing every few sentences to inquire whether the accomplice had made the statement.

The witness continued to invoke his right against self-incrimination and refused to answer. The United States Supreme Court held that the defendant's right to confrontation had been denied because he was unable to cross-examine the accomplice as to the substance of the statement. The court further recognized that the right to cross-examine the prosecutor or the law enforcement officer who took the statement of the original declarant in no way satisfied the confrontation clause. The court said:

"But since their evidence [referring to the reading by the prosecutor and the supporting evidence of the law enforcement officers] tended to show only that [the accomplice] made the confession, cross-examination of them as to its genuineness could not substitute for cross-examination of [the accomplice] to test the truth of the statement itself." (at 420)

Substantially the same type of cross-examination was attempted here. All that the cross-examination of Detective Halvorson could show was that he was present each time Eiland gave the statement; but, as the cross-examination revealed, Detective Halvorson had no way of knowing whether Eiland was lying· or telling the truth, and no amount of cross-examination of the police officer could have tested the veracity of Eiland's out-of-court statements.

The state in urging the inapplicability of *Douglas* points out that in *Douglas* the defendant objected to the testimony, while in the instant case the defendant did not. It also argues that the case is to be distinguished because the statement in *Douglas* was read in a question-and-answer form, while in the instant case the police officer's testimony was primarily a narrative account of what Eiland said in the out-of-court statements. That latter objection, we think, has no substance whatsoever if the confrontation clause is otherwise implicated because there

was no opportunity for cross-examination. The form in which the out-of-court and uncross-examined declarations are submitted is irrelevant.

Again, however, we are confronted with the inexplicable failure of defense counsel to object to this clearly inadmissible testimony. Had an appropriate objection been made, the trial judge would have been given the opportunity to exclude testimony, the admission of which, we conclude, constituted plain error and mandates reversal.

The lack of objection by defense counsel, accordingly, goes not to whether there was a violation of the defendant's constitutional rights of confrontation but to whether this court on review may, from the record itself, conclude that there was plain error which affected the substantial rights of the defendant and which warrants reversal.

Sec. 901.03, Stats., contains the provisions of the Rules of Evidence relating to objections and the review of errors made in the admission or exclusion of evidence. The following portions of that rule are pertinent to this appeal:

"901.03 Rulings on evidence. (1) Effect of Erroneous Ruling. Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected; and

"(a) *Objection*. In case the ruling is one admitting evidence, a timely objection or motion to strike appears of record, stating the specific ground of objection, if the specific ground was not apparent from the context; or

"   . . .

"(4) Plain Error. Nothing in this rule precludes taking notice of plain errors affecting substantial rights although they were not brought to the attention of the judge."[2]

---

[2] The rule focuses on whether the error is "plain" and whether it affects "substantial rights." As such, the rule serves a different purpose than the "interest of justice" rule contained in sec.

The plain-error rule, as set forth in sec. 901.03(4), Stats., is substantially identical to the plain-error rule in Rule 103(d) of the Federal Rules of Evidence. The Federal Advisory Committee Note to the Federal Rule of Evidence states that the wording of the plain-error rule is derived from the plain-error principle set out in Rule 52(b) of the Federal Rules of Criminal Procedure. Accordingly, case law under the analogous federal provisions is highly relevant in defining the scope of the plain-error rule under the Wisconsin Rules of Evidence.

Rule 52 of the Federal Rules of Criminal Procedure[3] makes explicit what is only suggested by the plain-error rule as contained in sec. 901.03(4), Stats.: That plain error is to be distinguished from harmless error depending on whether or not substantial rights are affected. Put another way, plain error on its face is *ipso facto* prejudicial; and once plain error is determined, no inquiry in respect to whether it is prejudicial is necessary or permissible.

Less obvious from the structure of Rule 52 is the fact that there may be a middle ground between plain error and harmless error.

"An error that did not prejudice the defendant is deemed 'harmless error,' and disregarded, even though

251.09, Stats. Unlike sec. 251.09, the plain-error rule does not implicate issues such as miscarriage of justice or probable different result on retrial. *See, Pappas v. Jack O. A. Nelsen Agency, Inc.*, 81 Wis.2d 363, 375, 260 N.W.2d 721 (1978). The values served by the plain-error rule are much more akin to those served by sec. 817.37, Stats., which antedates the new rules of evidence. *See, Claybrooks v. State*, 50 Wis.2d 79, 84–5, 183 N.W.2d 139 (1971).

[3] "Rule 52. Harmless Error and Plain Error

"(a) Harmless Error. Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded.

"(b) Plain Error. Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."

timely objection was made. If the error may have been prejudicial, and objection was made, it is 'reversible error.' Finally Rule 52(b) contemplates a class of 'plain error,' error so fundamental that a new trial or other relief must be granted even though the action was not objected to at the time." (footnotes omitted) 3 Wright, *Federal Practice and Procedure,* sec. 851 (1969).

Defining the scope of plain error has been difficult for the federal courts. Professor Wright has described the problem in the following terms:

"Courts have endeavored to put a gloss on the rule by defining the kind of error for which they can reverse under Rule 52(b). Thus it is said that 'plain error' means 'error both obvious and substantial,' or 'serious and manifest errors,' or 'seriously prejudicial error,' or 'grave errors which seriously affect substantial rights of the accused.' Perhaps these attempts to define 'plain error' do not harm, but it is doubtful whether they are of much help. The sounder perception is that when an appellate court should take notice of an error not raised below must be made on the facts of the particular case, and there are no 'hard and fast classification in either the application of the principle or the use of a descriptive title.' Indeed the cases give the distinct impression that 'plain error' is a concept appellate courts find impossible to define, save that they know it when they see it." (footnotes omitted) 3 Wright, *supra,* sec. 856.

In determining whether an error is plain or harmless, the quantum of other evidence properly admitted is relevant. Erroneously admitted evidence may tip the scales in favor of reversal in a close case, even though the same evidence would be harmless in the context of a case demonstrating overwhelming evidence of guilt. *Cf., Glasser v. United States,* 315 U.S. 60, 67 (1942). In the present case, other than the evidence implicating the defendant contained in the statement of Eiland, the only evidence connecting the defendant with the crime came

from David Guyton, one of the other participants in the crime, who was impeached by the state on the alleged ground that he had given inconsistent statements and whose credibility was additionally subject to question because he had been granted complete immunity in exchange for his agreement to testify against Virgil. We do not conclude that such evidence would have been insufficient to convict were it viewed alone, but it cannot be said beyond a reasonable doubt that the testimony of Eiland, which was put into evidence contrary to the salutary provisions of the Wisconsin and United States Constitutions, did not play a part in impelling the jury's verdict.

Moreover, the defendant's conviction was obtained through a violation of his confrontation rights under the United States and Wisconsin Constitutions. This violation of the defendant's constitutional rights is so serious, viewed in the context of the other evidence properly admitted in this case, that we conclude that the admission of the evidence constitutes plain error, requiring a reversal of the conviction.

The needs of our system of justice also bolster our view that the conviction must be reversed. A trial conducted in violation of the defendant's confrontation rights is a trial that flouts fundamental concepts of justice basic to our system. Where a defendant is convicted in a way inconsistent with the fairness and integrity of judicial proceedings, then the courts should invoke the plain-error rule in order to protect their own public reputation. *United States v. Vaughan,* 443 F.2d 92, 95 (2d Cir. 1971).

Accordingly, although an appropriate objection clearly should have been made by defense counsel and although such objection undoubtedly would have been sustained by the trial judge, the error was of a nature denominated as

"plain," because it affected substantial rights of the defendant and because the error permitted the trial to proceed in violation of a fundamental condition necessary for a fair trial. The defendant was denied any meaningful cross-examination. The evidence of Eiland was submitted in a hearsay form under circumstances which precluded defense counsel from testing its veracity and accuracy. Cross-examination, called by Wigmore, "the greatest legal engine ever invented for the discovery of truth" (5 Wigmore, *Evidence,* sec. 1367, p. 32), was absolutely precluded.

Other errors were also alleged, but in view of the compelling nature of the plain error discussed above, and because it is unlikely that the other alleged errors, if error they be, are likely to recur upon retrial, we do not address them.

In conclusion, we state again what must be obvious from this opinion: From neither the point of view of the prosecution or defense was this trial a model of good trial procedure. It would appear that the evidence properly admissible would have been sufficient to convict the defendant. Yet the prosecutor chose to sail close to the wind and to induce numerous evidentiary errors, one of which, the violation of the confrontation clause, requires a reversal and requires that a new trial be had, when a new trial would not have been necessary had the prosecution been carried out with reasonable zeal and discretion. Nor can we exonerate defense counsel. He persistently failed to object to patently inadmissible evidence, and most of these lapses are incapable of justification on the grounds of strategic waiver.[4] Had appropri-

---

[4] It is apparent in this case that prosecutorial excess went hand-in-hand with unsatisfactory representation by trial defense counsel. The application of the plain-error doctrine is particularly appropriate in this context, in order to prevent the prosecutor from taking unfair advantage. This aspect of the plain-error

ate and timely objections been made, the trial judge would have been given an opportunity to correct the record and to avoid the infringement upon the defendant's constitutional rights.

*By the Court.*—Judgment and orders reversed and cause remanded for a new trial.

BEILFUSS, C. J. (concurring). I agree that this case should be reversed and a new trial ordered primarily because it was so poorly tried, and to the degree that the defendant did not receive a fair trial as that rule is generally understood under our constitutional concepts as embodied in the Bill of Rights in the United States Constitution and our Wisconsin Constitution. The evidence in the case viewed in the light most favorable to the verdict is sufficient to sustain the conviction, but the trial was so infected by so many trial counsel errors, some substantial and some insubstantial, that a new trial should be ordered.

I further agree that this is not a conviction that should be reversed under sec. 251.09, Stats., in the interest of justice because it is not probable a retrial will bring a different result.

rule is recognized in 8B *Moore's Federal Practice,* para. 52.02[2] (2d ed. 1977):

"The plain error doctrine recognizes the need to mitigate in criminal cases the harsh effects of rigid application of the adversary method of trial, whereby the attorney's conduct binds his client. Particularly is such mitigation required if in fact, as is generally assumed, the competence of counsel in criminal cases does not meet the standards in other areas. Indirectly, the plain error doctrine has a salutary effect on the prosecution's conduct of the trial. If the intelligent prosecutor wishes to guard against the possibility of reversible error, he cannot rely on the incompetence or inexperience of his adversary but, on the contrary, must often intervene to protect the defendant from the mistakes of counsel."

I also agree that the majority's reliance on the plain error rule embodied in sec. 901.03(1) and (4), Stats.,[1] is appropriate. However I do point out that the language of the statute makes its application permissible or discretionary. This statute should be used sparingly and only in cases such as this, where a basic constitutional right has not been extended to the accused.

CONNOR T. HANSEN, J. (*dissenting*). The majority concludes that, although no timely objection was made, admission of testimony regarding Clarence Eiland's out-of-court statements was "plain error." I respectfully dissent.

The general rule in this state is that error may not be predicated upon the admission of evidence unless a substantial right of the party is affected and a timely objection appears of record. Sec. 901.03(1)(a), Stats.[1] Sec. 901.03(4) recognizes an exception to this rule and provides:

"PLAIN ERROR. Nothing in this rule precludes taking notice of plain errors affecting substantial rights although they were not brought to the attention of the judge."

---

[1] "901.03 *Rulings on evidence.* (1) *Effect of erroneous ruling.* Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected;

. . .

"(4) *Plain Error.* Nothing in this rule precludes taking notice of plain errors affecting substantial rights although they were not brought to the attention of the judge."

[1] Sec. 901.03(1), Stats., provides in part:

". . . (1) EFFECT OF ERRONEOUS RULING. Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected; and

"(a) Objection. In case the ruling is one admitting evidence, a timely objection or motion to strike appears of record, stating the specific ground of objection, if the specific ground was not apparent from the context; . . ."

This "plain error" exception is "consistent with s. 251.-09,"[2] Judicial Council Committee Note, 59 Wis.2d at R14, and is intended "to preserve the discretion of this court to review questions in the interest of justice even though they were not properly raised and preserved at trial." *Turner v. State,* 76 Wis.2d 1, 16, 250 N.W.2d 706 (1977). Thus the "plain error" statute does not alter, but merely preserves, this court's discretionary power to reverse or order a new trial in the interest of justice.

The exercise of this power is governed by well-established principles. For this court to exercise its discretionary powers in the interest of justice, this court must be convinced that the defendant should not have been found guilty, *McAdoo v. State,* 65 Wis.2d 596, 612, 223 N.W.2d 521 (1974); *State v. Hungerford,* 54 Wis.2d 744, 751, 196 N.W.2d 647 (1972), and it must appear that a new trial will probably result in acquittal. *State v. Lindsey,* 53 Wis.2d 759, 769, 193 N.W.2d 699; *State v. Heidelbach,* 49 Wis.2d 350, 360, 182 N.W.2d 497 (1971); *see: Roehl v. State,* 77 Wis.2d 398, 421, 253 N.W.2d 210 (1977).

The majority concludes that the focus of inquiry under the "plain error" exception is different from that under the "interest of justice" standard of sec. 251.09, Stats., and that the "plain error" standard "does not implicate

[2] Sec. 251.09, Stats., provides:

". . . *Discretionary reversal.* In any action or proceeding brought to the supreme court by appeal or writ of error, if it shall appear to that court from the record, that the real controversy has not been fully tried, or that it is probable that justice has for any reason miscarried, the supreme court may in its discretion reverse the judgment or order appealed from, regardless of the question whether proper motions, objections, or exceptions appear in the record or not, and may also, in case of reversal, direct the entry of the proper judgment or remit the case to the trial court for a new trial, and direct the making of such amendments in the pleadings and the adoption of such procedure in that court, not inconsistent with the statutes governing legal procedure, as shall be deemed necessary to accomplish the ends of justice."

issues of miscarriage of justice or probable different result on retrial." (Slip opinion at p. 20, fn. 2.) This is contrary to what we said in *Turner v. State, supra.*

Further, the standard proposed by the majority—whether an error has "affected the substantial rights" of the defendant—is the same standard set forth in sec. 817.37, Stats.[3] In *Claybrooks v. State*, 50 Wis.2d 79, 183 N.W.2d 139 (1971), cited by the majority, this court applied this "substantial rights" standard to the review of two alleged errors in a trial court's jury instructions. This court held that this standard was not met with regard to the first error because the error "did not, in this case, result in a miscarriage of justice." *Claybrooks v. State, supra,* at 85. The second error was held similarly insufficient for reversal because it did not appear that "had such error not been committed, the verdict might probably have been different." *Claybrooks v. State, supra,* at 86.

Similarly, in *Christensen v. Economy Fire & Casualty Co.*, 77 Wis.2d 50, 63, 252 N.W.2d 81 (1977), after setting forth the "substantial rights" language of sec. 817.37, Stats., this court stated that the appropriate standard of review was whether, if the error had not been committed, the result " '. . . might probably have been more favorable to the party complaining' " or " 'would probably have been different,' " *quoting Nimmer v. Purtell*, 69 Wis.2d

---

[3] Sec. 817.37, Stats., provides:

". . . *Judgments; application to reverse or set aside; new trial; reversible errors.* No judgment shall be reversed or set aside or new trial granted in any action or proceeding, civil or criminal, on the ground of misdirection of the jury, or the improper admission of evidence, or for error as to any matter of pleading or procedure, unless in the opinion of the court to which the application is made, after an examination of the entire action or proceeding, it shall appear that the error complained of has affected the substantial rights of the party seeking to reverse or set aside the judgment, or to secure the new trial."

Although this section has been renumbered, its form has not been changed since its enactment in 1909, Laws of 1909, ch. 192.

21, 38, 39, 230 N.W.2d 258 (1975) ; *See: Green v. State,* 75 Wis.2d 631, 641, 250 N.W.2d 305 (1977) ; *Staples v. State,* 74 Wis.2d 13, 24, 245 N.W.2d 679 (1976) ; *Lutz v. Shelby Mut. Ins. Co.,* 70 Wis.2d 743, 751, 235 N.W.2d 426 (1975) ; *State v. Kuick,* 252 Wis. 595, 32 N.W.2d 344 (1948).

In *Lisowski v. Milwaukee Automobile Mut. Ins. Co.,* 17 Wis.2d 499, 503, 504, 117 N.W.2d 666 (1962), this court said:

> "A judgment will not be reversed on the ground of misdirection of a jury unless this court is of the opinion after an examination of the entire record that the error has affected the substantial right of the party seeking the reversal. Sec. 274.37, Stats. [now sec. 817.37] This is a test of probability, not possibility, requiring the entire evidence to show that had not the error occurred, the result would probably have been different. . . ."

*quoted* with approval in *Bohlman v. American Family Mut. Ins. Co.,* 61 Wis.2d 718, 726, 214 N.W.2d 52 (1974).

Thus, under either the "interest of justice" standard of sec. 251.09, Stats., or the "substantial rights" test adopted by the majority, it must appear that the defendant is likely to be acquitted on a retrial. This requirement is not met here. Indeed, the majority virtually concedes as much when it states that "[i]t would appear that the evidence properly admissible would have been sufficient to convict the defendant." Although the majority points out considerations which may tend to reduce the credibility of the incriminating testimony of the defendant's accomplice, David Guyton, the majority does not conclude that Guyton's testimony would have been insufficient to convict the defendant, but rather characterizes Guyton's testimony as "convincing evidence of Virgil's guilt. . . ."

Guyton testified in detail regarding Virgil's participation in the crime. His testimony was corroborated by

·

circumstantial evidence, and was not inherently incredible. This testimony was sufficient to sustain a conviction. It cannot be said, therefore, that the defendant should not have been convicted or that a new trial will probably result in acquittal. For that reason, this is not, in my opinion, an appropriate case for the exercise of this court's power to review plain errors pursuant to sec. 901.03(4), Stats.

It is important to emphasize that even where an error is "plain," the decision to consider such an error in the absence of a timely objection rests in the discretion of this court. *Langston v. State,* 61 Wis.2d 288, 293, 212 N.W.2d 113 (1973) ; *Claybrooks v. State, supra,* at 85; *Claybrooks v. State,* 50 Wis.2d 87, 89, 183 N.W.2d 143 (1971) ; *see: McClelland v. State* ante, p. 145, 267 N.W.2d 843 (1978) (where no timely objection is made "the defendant is not entitled to have the matter considered on appeal as a matter of right.") If the rule were otherwise, the "plain error" exception would swallow the timely objection rule of sec. 901.03(1), Stats., which, by its terms, applies to errors affecting substantial rights.

Because important public purposes are served by the timely objection requirement, this court's discretion to notice "plain errors" should be exercised sparingly and only in "exceptional circumstances." *United States v. Atkinson,* 297 U.S. 157, 160 (1936). The importance of timely objection rules was discussed by the Supreme Court of the United States in the recent case of *Wainwright v. Sykes,* 433 U.S. 72 (1974). In that case, the Supreme Court held that a federal habeas corpus petitioner could not raise a constitutional challenge to the admission of a confession in his trial in state court, where the petitioner had not complied with the contemporaneous objection rule of the state court, and where the petitioner failed to show "cause" for his failure to make a timely objection and "prejudice" as a result of admission of the evidence.

The court emphasized the salutary purposes furthered by timely objection rules such as sec. 901.03(1), Stats. As the court pointed out, a timely objection enables the record to be made with regard to an objection while the recollections of witnesses are fresh. It permits the trial judge, who has observed the witnesses' demeanor, to make any factual determinations necessary for decision of the constitutional question. A timely objection contributes to the finality of litigation and the orderly administration of justice by affording the trial court an opportunity to exclude the evidence objected to, thus possibly avoiding the need for a new trial.

In addition,

". . . [a]n objection on the spot may force the prosecution to take a hard look at its hole card, and even if the prosecutor thinks that the state trial judge will admit the evidence he must contemplate the possibility of reversal by the state appellate courts or the ultimate issuance of a federal writ of habeas corpus. . . ." *Wainwright v. Sykes, supra,* at 89.

The Supreme Court observed that a rule which, as a matter of course, permitted defense counsel to raise constitutional claims for the first time on review might encourage "sandbagging" on the part of defense lawyers, who might take their chances on a verdict of not guilty in the trial court with the intent to raise their constitutional claims on review if their initial gamble did not pay off. *Wainwright v. Sykes, supra,* at 89.

Further, the Supreme Court noted that a contemporaneous objection rule promotes the perception of a criminal trial as a decisive and portentous event and properly makes it the "main event" in the proceedings, rather than a "tryout on the road" for later proceedings where the decisive constitutional issues will be raised for the first time. The Supreme Court observed:

". . . A defendant has been accused of a serious crime, and this is the time and place set for him to be tried by a

jury of his peers and found either guilty or not guilty by that jury. To the greatest extent possible all issues which bear on this charge should be determined in this proceeding: the accused is in the courtroom, the jury is in the box, the judge is on the bench, and the witnesses, having been subpoenaed and duly sworn, await their turn to testify. Society's resources have been concentrated at that time and place in order to decide, within the limits of human fallibility, the question of guilt or innocence of one of its citizens. Any procedural rule which encourages the result that those proceedings be as free of error as possible is thoroughly desirable, and the contemporaneous-objection rule surely falls within this classification." *Wainwright v. Sykes, supra,* at 90.

These purposes are served by the timely objection rule set forth in sec. 901.03 (1), Stats. I do not believe they should be defeated by construing the "plain error" exception so as to swallow the timely objection rule. I believe the "discretion of this court [under the plain error exception] to review questions in the interest of justice even though they were not properly raised and preserved at trial," *Turner v. State, supra,* at 16, is constrained by the same standards which govern discretionary reversal under sec. 251.09, Stats. Because those standards are not met here, I would affirm the judgment of conviction and the order denying the postconviction motions of the defendant.

I am hereby authorized to state that Mr. Justice HANLEY and Mr. Justice CALLOW join in this dissenting opinion.