MAAHS, Respondent, vs. SCHULTZ, Appellant.

*March 10—April 5, 1932.*

For the appellant there was a brief by *Eberlein & Larson* of Shawano, and oral argument by *M. G. Eberlein.*

For the respondent there was a brief by *Fischer & Brunner* of Shawano, and oral argument by *L. J. Brunner.*

OWEN, J. The plaintiff brings this action against the defendant to recover damages for the alienation of the affections of plaintiff's wife by the defendant. During the summer of 1929 the plaintiff was the proprietor of a filling station at Tilleda, Shawano county. In connection with said filling station he conducted a rooming and boarding house, a restaurant, and dispensed drinks. The defendant resided in the city of Shawano and was a contractor of highway construction. During the summer of 1929 he had a construction job in the vicinity of Tilleda. He with some of his men boarded at plaintiff's house and the plaintiff worked for him on the job. Plaintiff's wife left him on the 2d day of February, 1931.

The jury returned a verdict in favor of the plaintiff for $4,000 actual damages and $1,000 punitory damages. The court gave the plaintiff the option of taking judgment for $2,000 compensatory damages and $1,000 punitory damages, or a new trial. The plaintiff exercised the option to accept $2,000 compensatory damages, and judgment was rendered in favor of the plaintiff for $3,000 with costs.

It is strenuously contended upon this appeal that the verdict in favor of the plaintiff finds no support in the evidence. This contention requires us to review somewhat in detail the evidence relied upon by the plaintiff to support the verdict, and necessitates a review of the relations existing between the plaintiff and defendant and their families during the period intervening between the summer of 1929 and the time when plaintiff's wife left him on the 2d day of February, 1931.

As already stated, when the defendant entered upon his construction work at Tilleda in 1929 he and some of his men boarded with the plaintiff. The plaintiff was hired by the defendant to drive one of his trucks while he was at work on that job, and after that job was completed he continued to work for the defendant on other jobs, prosecuted at some distance from Tilleda. Although it does not appear that plaintiff and defendant were friends or even acquaintances prior to the time defendant entered upon his construction work at Tilleda, it does appear that real close social relations developed between the two families thereafter. Mrs. Schultz and Mrs. Maahs became quite friendly, and visits between the two families were not infrequent.

The tangible events relied upon by the plaintiff to establish the fact that his wife's affections were alienated by the defendant Schultz are as follows: On Thanksgiving Day in 1929 the plaintiff and his wife accepted the invitation of defendant and his wife to visit their home at Shawano and attend a dance in the evening. Plaintiff and his wife drove

to the defendant's home in their car. During the evening they took plaintiff's car and went to the dance. They returned from the dance in plaintiff's car to the defendant's home. It had been arranged that plaintiff would drive defendant's car to the plaintiff's home, as his car had not been working well on the trip to Shawano. Defendant brought the car to a stop in front of his home. Defendant's wife and the plaintiff got out of the car and the plaintiff went into the house for the purpose of getting a sweater and his son, who accompanied them on the trip. He testifies that when he came out of the house the defendant was hugging his wife in the car. He, however, said nothing about it at the time, nor did he speak to his wife about it for some time thereafter, if at all.

Plaintiff fixed a second act of impropriety at a time one year later, when the plaintiff and his wife again visited defendant's home and attended a dance at Shawano. After the dance they repaired to the defendant's home, and Mrs. Maahs fried some fish, as Mrs. Schultz was not feeling well. The plaintiff testifies that by the aid of reflections from two mirrors, he saw defendant kiss his wife while she was frying fish in the kitchen.. At this time he and Mrs. Schultz were sitting in the living room. He said nothing about the incident to Mrs. Schultz, nor did he ever say anything about it to the defendant, nor to his wife.

Plaintiff testifies to another act of coarse and disgusting familiarity which occurred in his saloon or soft-drink parlor at Tilleda when he and Mrs. Schultz were present. He says defendant's wife could not see this, but he saw it. This was in the winter of 1930. These were the only tangible events to which the plaintiff testified.

Three women residing in Tilleda testified for the plaintiff. They were Mrs. Claude Felts, his sister, Mrs. Esther Reinert, his sister, and Mrs. C. O. Felts, a sister-in-law of Mrs. Claude Felts. They testified generally that the defend-

ant was a very frequent visitor at the Maahs home, and that they observed his car standing in front of the filling station nearly every day. They testified that upon one occasion they saw defendant and Mrs. Maahs leave the filling station in defendant's automobile at about 11:30 o'clock at night and that they did not return until 12:30.

Mrs. Claude Felts also testified to a circumstance which she claims to have taken place at the filling station one night when, apparently, considerable drinking was being indulged. This is apparently the same time when the plaintiff claimed the defendant took his third liberty with his wife, testified to by him. Mrs. Felts testified that Mr. Schultz came out of the saloon and called across the street to Mrs. Reinert to come over and celebrate his second wedding to Mrs. Walter Maahs. Mrs. Felts did not go inside, but she stood five feet from the window on the walk. The defendant was dancing with Mrs. Walter Maahs. "There was something laying on the floor, but I could not see what it was, and Mrs. Maahs turned around and picked it up, and he took her skirts up and she was standing there with her clothes up." It is to be remembered that during this time Mrs. Schultz and Mr. Maahs were about, and it also appears that Mr. Reinert was present. She also testifies to an indecent liberty on another occasion, witnessed while she passed the filling station.

Henry Reinert, a son of Mrs. Reinert, testified that he went into the filling station one day and saw Mr. Schultz sitting on Mrs. Maahs' lap, with his feet up on the table, hugging her. He said that Harvey, a son of Mr. and Mrs. Maahs, was with him at the time.

One Fred Ross testified that upon a certain occasion in 1930 he saw Mrs. Maahs and Mr. Schultz sitting in a parked car on the south side of the filling station and he had his arm on the back of the seat. The lights were on in the

filling station and it was perfectly light where they were sitting.

Another witness testified that upon another occasion he saw the defendant and Lydia Maahs together upon the highway at Thornton. His car was parked on one side of the highway and her car on another. He had left his car and was sitting in her car with her. This was in broad daylight and about 300 feet from a boarding house, where several people were sitting on the front porch.

Another piece of testimony was given by Mrs. John Fink, who testified that on a Sunday in April, 1930, Emil Schultz called at her house to see her son. Mrs. Maahs and Mrs. Schultz were with him. Mrs. Maahs sat between Mr. and Mrs. Schultz, and during this time the defendant "was fooling with Mrs. Maahs. He was mussing around her face. He acted as though he wanted to hug her up." This witness was also permitted to testify that later during the summer she saw Mrs. Maahs go by with her car, and five or ten minutes afterwards the defendant Schultz went by with his car.

Mrs. John Grosskopf testified that on March 10, 1931, she saw the defendant and Mrs. Maahs driving along a highway in a car in broad daylight. She admitted that she was a friend of Mrs. Claude Felts and visited back and forth with Walter Maahs and his sisters. She further testified that she marked the date of this occasion on her calendar.

Another witness testified that some time during the summer of 1930 he saw the defendant and Mrs. Maahs drinking beer in the waiting room of the Wisconsin Hotel at Shawano.

This, in rather brief epitome, is the testimony upon which plaintiff relies to support the verdict of the jury. The defendant urges that much of this evidence is incredible. The weighing of the evidence is distinctly a function of the jury.

While there are many facts, considerations, and circumstances which seem to render improbable a finding that the defendant's conduct was the controlling cause of plaintiff's loss of his wife's affections, nevertheless it plainly was the function of the jury to weigh all of the facts and circumstances and to come to such a conclusion as they might be persuaded was supported by the weight of the evidence. *State v. Hintz*, 200 Wis. 636, 229 N. W. 54.

While we have no disposition to disturb the judgment on the ground that the verdict is not supported by the evidence, the fact that we are about to consider certain alleged errors of procedure in which the question of whether they amount to reversible error will depend upon the conclusive character of the evidence to support the verdict, leads us to now emphasize the evidence relied upon by the defendant. At the outset it is to be conceded that within a year and a half after the defendant and the plaintiff's wife became acquainted she deserted the plaintiff and abandoned his home. Plaintiff and his wife were married in 1916 and they lived together for a period of about fourteen years. Plaintiff was a working man, was apparently thrifty and saved his money, until he was able to finance the filling station and business which he conducted in connection · therewith at Tilleda. His wife worked hard in connection with this business. She not only tended the filling station, but she sold drinks, prepared the meals, and kept house. The drinking feature of plaintiff's business attracted rough and coarse patrons whom she was obliged to serve. In addition to this, the plaintiff encouraged the playing of cards for drinks, and plaintiff's wife was expected to participate in such card games. She testified that she did make complaint to her husband that this was not a woman's work, and that she resented certain remarks which her husband made concerning her personal appearances and attractions to the patrons· of the place. She also testified that she commenced to lose

her respect for her husband when he told her about certain pilgrimages he had made "with the boys" to certain road-houses and sporting places. However, the first of these incidents occurred some four years prior to her desertion, and they were infrequent at the best. What she knew about his behavior in such respects was communicated to her by himself, and stopped short of bad revelations. There seemed to be no disposition on his part to conceal from her the part that he played in such escapades. On the other hand, it is quite apparent that she did not leave her husband with a view of marrying the defendant. That was impossible. He was a married man and, so far as the record discloses, was living happily with his wife, and his wife and Mrs. Maahs were good friends. Whatever the relation between the defendant and Mrs. Maahs might have been, it was not such as to disturb the family relations in his household, neither was it such as to estrange Mrs. Maahs and Mrs. Schultz.

It does appear that the sisters of Mr. Maahs, as well as Mrs. C. O. Felts, were decidedly unfriendly to Mrs. Maahs. One of them had had a fight with Mrs. Maahs, and the plaintiff went with Mrs. Maahs to the district attorney to secure protection for the personal safety of Mrs. Maahs. It is without dispute that they spied on her, as Mrs. C. O. Felts testified that when she saw the defendant and Mrs. Maahs leaving the filling station for the automobile ride at 11:30 in the evening, she and Mrs. Claude Felts were sitting up watching.

The purpose and character of the surveillance which was kept on Mrs. Maahs by certain women in Tilleda is indicated by the testimony of Mrs. Grosskopf, who testified that she was friendly with the sisters of Walter Maahs and visited back and forth with them. She it was who marked on the calendar the date when she claimed to have seen Mrs. Maahs and Mr. Schultz out riding on the 10th day of March, 1931.

It is significant, also, that during all of this time, when plaintiff's sisters claimed to have seen so much to arouse their suspicion with reference to the relations existing between the defendant and Mrs. Maahs, they never mentioned the fact to their brother. They said nothing to him about these intimacies between this couple until after Mrs. Maahs left the plaintiff. It was very easy for his sisters to testify that the defendant's car was parked in front of the filling station nearly every day. It is conceded that he was there frequently when he was working at Tilleda, and in the vicinity of Tilleda, during which time he made the plaintiff's home his headquarters. It is also significant that the plaintiff himself never remonstrated with the defendant concerning his intimacies with his wife, and that he was friendly with the defendant and worked for him a goodly portion of the time down to the very date that Mrs. Maahs left his home. Neither is there any persuasive evidence that he ever remonstrated with his wife about the matter. All of these intimacies are flatly denied by the defendant and Mrs. Maahs and Mrs. Schultz. Mrs. Maahs and Mrs. Schultz both testified that Mrs. Schultz not only accompanied them on the automobile ride at 11:30 in the evening, but that Mrs. Schultz was the one that suggested the ride in Mr. Schultz's new car.

These are some of the considerations which cannot but cast doubt upon the conclusion that the defendant was the controlling influence in alienating the affections of the plaintiff's wife. With this understanding of the record, we will now consider some of the procedural errors relied upon for a reversal of the judgment.

The first question of the special verdict is this: "Was the defendant, Emil Schultz, guilty of any acts or conduct that was a controlling cause of the alienation of the affection of the plaintiff's wife, Lydia Maahs, from him?" It is claimed that this question constituted error, as defendant's liability

depended not upon whether his conduct was "a" but whether it was "the" controlling cause. A cause of action for alienation of affections seems to consist of three elements: (a) the wrongful conduct of the defendant; (b) plaintiff's loss of the affection or consortium of the other spouse; and (c) causal connection between such conduct and such loss. Note, 4 A. L. R. 497; *Wallace v. Wallace,* 85 Mont. 492, 279 Pac. 374, 66 A. L. R. 587, 596. If we were to apply to this class of cases the rule applied to negligence cases, where it is held that there can be more than one proximate cause of an accident, it is apparent that if the conduct of the defendant were "a" controlling cause, liability might exist though defendant's conduct was not "the" controlling cause. However, we think the two actions are inherently different, and that while many circumstances may contribute to the alienation of affections, there can be but one controlling cause, and if the defendant is liable his conduct must be "the" controlling cause. That is the way the rule is stated in three of our cases. *Kadow v. Kadow,* 195 Wis. 650, 219 N. W. 275; *McLery v. McLery,* 186 Wis. 137, 202 N. W. 156; *Baird v. Carle,* 157 Wis. 565, 147 N. W. 834.

We cannot approve of the manner in which question 1 was framed. The court in a measure cured the error by its instruction charging the jury thus:

"Your attention is called to the words 'controlling cause' in this question, or as used in this question. That means the actual influence that would cause the alienation of affections, and it will be your duty to consider all other causes, if any, as may be disclosed by the evidence for which the acts or conduct of the defendant would not be responsible, if you find that to be a fact, and if you find that the evidence is so evenly balanced that you could not determine on which side it preponderates, you will answer this question No. 1 'No.' "

Although the language of this instruction is not all that could be desired from the standpoint of clarity, the court evidently there had in mind an attempt to state the correct

rule. However, in connection with the same question, the court said:

"You will therefore consider all the evidence bearing on this question No. 1, and if you find by a preponderance of the evidence to a reasonable certainty that the defendant Emil Schultz was guilty of any acts or conduct that was a controlling cause of the alienation of the affection of the plaintiff's wife, Lydia Maahs, from him, you will answer this question No. 1 'Yes.' "

The effect of these two statements must have been confusing to the jury. When we reflect that the special verdict containing the expression "a controlling cause" was taken with them to the jury room where they had it continually before them, it cannot be said, we think, that the instruction which they listened to but once was sufficient to erase from their minds the impression which must have been made by the language of the question.

Furthermore, we think the court should have given some of the direct and incisive instructions upon this question requested by the defendant. A number of instructions along this line were requested, but reference to the first will be sufficient to indicate a clarity not to be found in the instructions given by the court. That instruction was:

"You are instructed that if the jury believe from the evidence that the plaintiff himself by his own misconduct brought about the trouble between him and his wife, or that she of her own accord left him, and was not induced so to do wrongfully and maliciously, then you should find for the defendant."

We think the defendant was entitled to have had the jury given this clear, direct, and material statement in the form of an instruction. While we may discover the same thought by careful analysis of the instruction given by the court, the thought does not stand out as clear and definite as it is stated

in the requested instructions, of which the one quoted is a sample.

Question No. 3 of the special verdict inquired: "Did the defendant, Emil Schultz, commit an act of adultery with Lydia Maahs, plaintiff's wife?" The court instructed the jury that in order to answer this question "Yes" it was necessary for them to be satisfied by a clear and satisfactory preponderance of the evidence to a reasonable certainty. Appellant contends that the court should have given the jury the same rule with reference to questions No. 1 and No. 2. Question No. 1 has already been quoted. Question No. 2 was: "If you answer question No. 1 'No' you need not answer question No. 2. If you answer question No. 1 'Yes' then answer question No. 2. Were such acts the result of malice or bad intent on the part of the defendant, Emil Schultz, toward the plaintiff, Walter Maahs?" With reference to these questions the court told the jury that in order to answer them "Yes" they should be satisfied by a preponderance of the evidence to a reasonable certainty.

The court was correct in the rule given to the jury with reference to each question. An affirmative answer to question No. 3 established a crime on the part of the defendant. Where the facts relied upon for a recovery amount to a crime on the part of the defendant, the rule is that the jury must be satisfied by a clear and satisfactory preponderance of the evidence to a reasonable certainty. *Oberleitner v. Security Ins. Co.* 199 Wis. 220, 225 N. W. 735. The first and second questions did not call for this degree of proof in order to warrant an affirmative answer. The instructions of the court in these respects were entirely in accord with the established rules.

We have now to consider another incident occurring during the trial which was of no inconsiderable moment. A juror, Arthur Fuhrman by name, sat upon the jury. Dur-

ing his examination upon *voir dire* he disclaimed any relationship to the parties to the action or any knowledge or information concerning the case. After the trial had proceeded for a day, defendant's attorney was informed that Fuhrman was related to one of the parties. He brought this information to the attention of the court. The court took the juror, with the respective counsel, into chambers and questioned him with reference to the report. He again disclaimed any relationship and denied that he had ever heard anything about the case. After he had left the chambers the defendant's attorney offered to excuse this juror and proceed with the trial before eleven jurors. Plaintiff's attorneys declined this offer, so the trial proceeded with the juror Fuhrman on the jury. After the rendition of the verdict a hearing was had before the court concerning the qualifications of Arthur Fuhrman to sit on the jury.

Appellant's attorney contends that the evidence taken upon this hearing shows that the juror Fuhrman was related to Walter Maahs. It may be that through intermarriage of distant relatives of juror Fuhrman some remote and attenuated relation between the two can be spelled out. However, a little more direct relationship was established between the juror Fuhrman and Lydia Maahs. It appears that a sister of juror Fuhrman married one Albert Spiegel, and that Albert Spiegel is a cousin of Lydia Maahs. We do not consider this relationship so close as in and of itself to constitute a disqualification of the juror Fuhrman. The evidence concerning his relationship, however, discloses that he must have been acquainted with some of those who were very much interested in giving testimony upon the trial. There is some reason to believe that the case was one of some notoriety in that county. It was stated upon the oral argument that the trial of the case attracted the largest crowd that had ever packed the Shawano county court house. Upon the inves-

tigation of the qualifications of the juror Fuhrman after the trial, one Albert Spiegel, who is a brother-in-law of juror Fuhrman and a cousin of Lydia Maahs, testified that a few days before the trial, and after Fuhrman had served on the jury panel at previous trials, there was a party at Fuhrman's house; that he, Spiegel, and his wife were present at that party; that they played cards at the party; that Mr. and Mrs. Fraling were there; that while they were all sitting at the kitchen table playing cards, Mr. Fraling said: "Next week the Maahs case is coming off." I says, "Both of them ought to get Waupun. Mr. Fuhrman was at the same table when I said that."

This testimony concerning Fuhrman's knowledge of the case was not easy to obtain, and it was only after diligent effort on the part of defendant's attorney that he was able to make this showing bearing upon the qualifications of juror Fuhrman. This evidence leaves upon our minds the distinct impression that the juror Fuhrman knew more about this case than he revealed, and leaves the suspicion that he suppressed his knowledge of the case for some purpose. Perhaps it cannot be said that his disqualification was definitely proved, and in view of the fact that the trial court did not disturb the verdict by reason of this showing, the case should not be reversed on this ground alone, because of the inconclusiveness of the evidence establishing disqualification. We may say, however, that there is nothing so essential in the administration of justice as the avoidance of seeming partiality. Every suitor is entitled to have his case tried before an impartial forum. Every effort should be made to avoid any reason for suspicion on the part of a suitor that he has not had a fair and impartial trial. As said in *Hall v. Thayer*, 105 Mass. 219, at p. 221:

"The provision of art. 29 of our Declaration of Rights, that 'it is the right of every citizen to be tried by judges as

free, impartial, and independent as the lot of humanity will admit,' rests upon a principle so obviously just, and so necessary for the protection of the citizen against injustice, that no argument is necessary to sustain it, but it must be accepted as an elementary truth."

What the court there said with reference to judges applies with equal if not greater force with reference to jurors.

While we are reluctant to hold that question 1 as framed, and the instructions given upon that question, constitute reversible error, we are satisfied that the jury would have had a much clearer conception of their duty if the question had contained the expression "the controlling cause" instead of "a controlling cause." We are also satisfied that the requested instructions of the defendant, or some of them, if given, would have been beneficial to the understanding of the jury of the matters submitted to them. We are not at all satisfied that the juror Fuhrman should have been permitted to sit on the jury, nor that, in the interest of justice, a verdict subject to his influence should be permitted to stand. A perusal of the record leaves us with very grave doubts as to the justice of the verdict rendered in this case. Under the circumstances, we have decided to exercise the power, very sparingly used, conferred upon us by sec. 251.09, Stats., and order a new trial. *Paladino v. State,* 187 Wis. 605, 205 N. W. 320; *State v. Hintz,* 200 Wis. 636, 229 N. W. 54. Our mandate therefore is:

*By the Court.*—Judgment reversed, and cause remanded for a new trial.