STATE of Minnesota, Respondent,

v.

Kling Emmett BERRY, Jr., Appellant.

No. 49786.

Supreme Court of Minnesota.

Sept. 4, 1981.

Rehearing Denied Oct. 20, 1981.

Jack Nordby, Minneapolis, for appellant.

Warren Spannaus, Atty. Gen., Gary Hansen and John H. Daniels, Jr., Sp. Asst. Attys. Gen., St. Paul, Thomas L. Johnson, County Atty., Minneapolis, for respondent.

PETERSON, Justice.

Defendant Kling Emmett Berry, Jr., was convicted of first-degree murder by a district court jury for causing the death of Ellen Hreha "while committing or attempting to commit" upon her "criminal sexual conduct in the first or second degree with force or violence." Minn.Stat. § 609.185(2)

(1980). On this appeal from judgment of conviction defendant contends (1) that the trial court erred in concluding a prosecution witness was competent to testify at trial, (2) that testimony regarding certain out-of-court statements of that witness was improperly admitted, (3) that there was insufficient evidence to sustain the jury's verdict, (4) that certain evidence was so prejudicial as to require reversal, (5) that the trial court should have instructed the jury regarding lesser included offenses and (6) that defendant did not receive effective assistance of counsel. We affirm.

For the 10 or 12 years preceding her death on July 5, 1978, at the age of 70, Ellen Hreha made her home with the Berry family in Minneapolis. At the time of the events in question the household also included defendant, age 50, Verchie Berry, defendant's wife, and Verna Berry, defendant's aunt and stepmother.[1] Verna Berry suffers from a disorder diagnosed as paranoid schizophrenia.

On the afternoon of July 4, 1978, the Berrys held a barbecue for several friends and family members. Andrea Mains was one of their guests. At trial Ms. Mains testified that everyone at the barbecue, except the children, was drinking whiskey when she arrived at 2 p. m.

Ms. Mains left the party at about 7 p. m. and went to her sister's house to babysit for her nephew. In the course of the evening Ms. Mains received five telephone calls from defendant. He first called between 7:30 and 8 p. m. and asked to speak with Ms. Mains' sister or her sister's boyfriend, who is defendant's wife's son by a previous marriage. When Ms. Mains informed defendant that neither person was at home, defendant told her that the police had taken his wife to a detoxification center for the night. Defendant telephoned again about one-half hour later. Ms. Mains testified that he seemed somewhat upset. Defendant called a third time at 10 p. m. He seemed "very upset" and swore at Ms. Mains. At 11 p. m. he called a fourth time

---

1. Defendant's deceased mother was Verna Berry's sister. In 1972, after her sister's death, Verna Berry married defendant's father. Defendant's father is now deceased.

and again spoke abusively to Ms. Mains. He mentioned that his wife was in the detoxification center and explained that "she'd called them on him and they wouldn't take him so they took her." Shortly after midnight defendant phoned a fifth time. He told Ms. Mains that "something had happened" to Mrs. Hreha, that "she was dead." Ms. Mains advised defendant to notify the police.

At approximately 1 a. m., Larry Moskalik, a captain in the Minneapolis fire department, Steven Sorbel, a firefighter, and two other fire department personnel went to the Berry residence in response to an emergency call. Verna Berry met them on the front porch and led them into the house. On the living room floor they found Mrs. Hreha, lying on her back. Her blouse was unbuttoned and her brassiere in disarray. The rest of her body was unclothed. A blanket covered her from the waist down.

Captain Moskalik could not find Mrs. Hreha's pulse, and he detected no respiration. He asked defendant, who was standing in the doorway to the living room, what was wrong with Mrs. Hreha. Defendant "didn't seem to know." Captain Moskalik immediately began to perform cardio-pulmonary resuscitation (CPR) on Mrs. Hreha. Sorbel, who was assisting Captain Moskalik, observed a bruise on Mrs. Hreha's left temple. He also noticed excrement on the thumb and index finger of her right hand.

An emergency paramedic arrived at the Berry residence while the firemen were performing CPR on Mrs. Hreha. He assisted them in trying to get her heart to resume beating. Mrs. Hreha did not respond to their attempts. A physician whom the paramedic consulted by radio pronounced her dead.

Minneapolis police officers John Resch and Richard Strahura arrived at the Berry residence shortly thereafter. Verna Berry was sitting on a couch in the living room; Officer Resch testified that she seemed "distraught" and "emotionally upset." Defendant was in the kitchen drinking a beer. When Officer Resch asked defendant what had happened, defendant told him that he had been asleep and was awakened by a noise. He said that he got up out of bed, found Mrs. Hreha lying on the living room floor, and called an ambulance.

Jessie LaFrance, defendant's wife's daughter by a previous marriage, was the next person to arrive at the Berry residence. She came in response to a telephone call from defendant in which he told her of Mrs. Hreha's death. When Mrs. LaFrance entered the living room, she saw Mrs. Hreha lying on the floor and Verna Berry still sitting on the couch, near Mrs. Hreha's head. To Mrs. LaFrance, Verna seemed "really in bad shape" and "in a state of shock." She described Verna as looking "like she was just ready * * * to explode."

Mrs. LaFrance was immediately concerned about Verna. She asked Verna what had happened. Over defense counsel's objection, the trial court allowed Mrs. LaFrance to testify regarding Verna's answer. Mrs. LaFrance stated that Verna said defendant had come into her bedroom while she was sleeping, had pulled on the curlers in her hair, and, when she fought back, had hit her. Verna told Mrs. LaFrance that she later heard Mrs. Hreha yelling, "Verna, help me." Verna said she went from her bedroom into the dining room and "saw [defendant] on top of [Mrs. Hreha]." Mrs. LaFrance testified:

> Well, when I asked her why—I says, "Verna, what happened?" And she says, "Kling attacked [Mrs. Hreha] and jerked her on the floor, off of the couch, and he was trying to rape her." And I says, "Are you sure?" She said, "Yes, his underwear was down and he was raping her." And she was, you know, telling him to get off her and leave her alone, he'd kill her, she was an old woman. He told [Verna] if she didn't shut up and go back to her room; he would kill her.

Mrs. LaFrance immediately approached Officer Strahura, who was preparing a report, and asked to speak to him. Officer Strahura and Mrs. LaFrance conversed, then he and Officer Resch spoke with Verna. The trial court allowed Officer Resch to testify regarding what Verna said to him:

Verna told me that she had been asleep in another bedroom. Believe it was a room adjoining the dining room. She was awakened by Kling, who was attempting to attack her sexually. She stated that she had refused his advances and fought him off to a point.

He then left her room and a short time later she had heard the deceased screaming for her to help her. She stated that she got out of bed, went to the front room of the house where she observed Kling on top of the deceased, who was on the floor. She stated she made a remark, "Oh, Kling." And Kling looked up and told her to get out of the room or he'd kill her.

[Verna] then left the room, went back to her bedroom.

After speaking with Verna, officers Strahura and Resch concluded that the case involved more than they had first thought. Officer Strahura contacted the police dispatcher and asked that detectives be sent to the scene.

Sergeants Robert Cook and Ronald Adler of the Minneapolis police department's robbery/homicide division responded to the dispatcher's call, arriving at the Berry residence at 2 a. m. Sergeant Cook summoned bureau of identification personnel to the scene to take photographs and collect physical evidence. Sergeant Cook testified that he observed scratches and abrasions on defendant's upper chest that appeared quite recent—there was fresh bleeding. He observed excrement on defendant's left thumb and thumbnail. Sergeant Adler testified that he also noticed an abrasion on defendant's upper left chest. He described it as "an open wound" that "looked wet." He observed another abrasion on defendant's right elbow, which also appeared fresh.

Sergeant Adler looked for signs of injury on Mrs. Hreha's body. He noted an abrasion on her forehead near the hairline and bruises on her inner left thigh near her vagina. Excrement was smeared on her right thigh; there was also excrement on the floor beneath her rectum.

Sergeant Adler then interviewed Verna. Over defense counsel's objection he was permitted to testify regarding what she told him:

[S]he told me that she had been in bed and Kling Berry had come into her bedroom and sat or stood near as she was in bed, began taking the curlers out of her hair and telling her that he was going to fuck her. She resisted at this time and after a small struggle and her resistance, she said Kling left the bedroom.

She said a few minutes later she heard the victim, Ellen Hreha, calling to her from the front room, "Verna, come help me."—something to that effect: Come help me, Verna. She said she got out of bed and went to the front room where the victim was lying on the floor in the same position as she was at the time that we were at the scene.

On top of the victim—She said Kling Berry was on top of the victim. She said he had his clothes off and his—all he was wearing was undershorts and they were pulled down. She said it looked as though he was having intercourse with Ellen at this time. She said she made some comment to Kling to leave her alone, and Kling told her to get out of the way; he would kill her.

Verna stated then that she went back to her bedroom and after a short time later—she was unable to tell us at this time what the time period was—but a short time later Kling came into her room again and said to her, "I think you better come out here and check Ellen. I think she might be dead." And Verna said that she went out then and checked for a pulse on Ellen and they couldn't find a pulse, and the police and ambulance were called.

Sergeants Cook and Adler together questioned defendant. Sergeant Adler described their conversation:

We then asked Kling what had happened. He said that he had gone to bed about 8:00 or 8:30 that night and that was the last time that he had seen Ellen, the victim, alive. He said he got up around 1:00 o'clock in the morning to

have a cigarette, and he found her on the floor in the room where she was laying at this time. This was the time—at the time we were at the house there. Then he asked us, he said, "What are you trying to say; I killed her?" I asked him, "Did you?" And he said, "No." I asked him if he had sex with her, and he said no. I asked him if he had tried to have sex with her, and he said no. I asked him if he had touched her after she died, and he said only to check for a pulse. He said that he found her on the floor in the same manner that she was lying at this time, on her back with the blanket on.

Defendant was subsequently arrested for murder.

Dr. Michael McGee, a physician employed as a medical examiner by Hennepin County, performed an autopsy on Mrs. Hreha on the day of her death. Dr. Coe, the chief medical examiner, observed the procedure. Dr. McGee's external examination of Mrs. Hreha revealed a laceration of the scalp on the back of her head, on the left side. The laceration was about 1½″ long and went through the entire thickness of the scalp so that one could touch the skull. There was considerable hemorrhaging in the soft tissue surrounding the laceration. There was an abrasion on Mrs. Hreha's left forehead, near the left corner of her eye. There was a laceration surrounded by a bruise at the right corner of her mouth. Dr. McGee found many small bruises on Mrs. Hreha's chest, in the sternal area. There were five separate bruises on the midportion of her inner left thigh. On the inner aspect of the outer lips of Mrs. Hreha's external genitalia Dr. McGee discovered abrasions and a small bruise. A laceration approximately ⅝″ in length extended outward from the inside of her anal canal. There was some hemorrhaging surrounding this laceration. Dr. McGee also noted abrasions and swelling in the soft tissue of both Mrs. Hreha's knees. He testified that all these external injuries were fresh.

Dr. McGee observed excrement on Mrs. Hreha's lower abdomen, on the front of her right thigh, and on both her hands. He testified that it is common for a person to defecate at the time of death because death is accompanied by a relaxation of the sphincter muscle. He stated, however, that the presence of excrement on Mrs. Hreha's hands indicated that she defecated before she died, when she could still move her hands.

Dr. McGee's internal examination of Mrs. Hreha disclosed nine broken ribs in the upper chest area with hemorrhaging in the surrounding muscle and soft tissue. The broken ribs, he testified, could have been caused by the CPR. Mrs. Hreha's left lung contained bloody fluid and was partially collapsed. In the soft tissue on both sides of her tongue and in the right tonsillar area Dr. McGee found bruises and bleeding.

Dr. McGee testified that Mrs. Hreha's injuries were insufficient to cause her death. In his opinion, her death resulted from cardiac arrhythmia—the irregular beating of her heart—brought on by the numerous traumatic injuries she received. Dr. Coe, who observed the autopsy as Dr. McGee was performing it, testified that he independently reached the same conclusion regarding the cause of Mrs. Hreha's death.

Wallace Sorum, an analyst with the Minnesota Bureau of Criminal Apprehension Laboratory, analyzed hair samples and skin scrapings taken from Mrs. Hreha and defendant, fingernail scrapings taken from defendant, and the clothing of Mrs. Hreha and defendant. He found no positive evidence of the presence of semen. He found blood in the chest area of the front of defendant's tee shirt, on the right cup of Mrs. Hreha's brassiere, and on her blouse. He testified that all the blood found on the clothing was Type O in the ABO group and Type PGM1 in the PGB group. He could not establish whether the blood was that of defendant or Mrs. Hreha. He testified that it could have been the blood of either.

Verna Berry, having been held competent to testify, was called at trial as a witness for the prosecution. She stated that she did not drink alcohol. With regard to what she saw on the night of Mrs. Hreha's death, when she was awakened and went to the

living room, Verna Berry testified as follows:

Q. Did you see Kling near Ellen?

A. Yes, I told you I did.

Q. Now, you tell me again what you saw Kling and Ellen doing. Come on now.

A. Yes. Well, they said fuck and that's not nice to talk.

Q. I know it isn't. But you must tell me what you saw.

A. Well, I—I tell him intercourse, but that's not nice.

Q. Okay. Did you see that happening?

A. Huh?

Q. Did you see that happening?

A. I told you yes.

Q. Is it true—Is it true, Mrs. Berry? Did you see it happening?

A. I told you. I told the truth.

Q. All right. Now, when this was happening, Mrs. Berry, who was on the bottom? Mrs. Berry, please answer, please. Who was on the bottom?

A. I told you Ellen was. Now, that's enough. I'm not bringing up her name any more.

Q. All right. Who was on the top? We'll talk about that. Who was on the top?

A. I told you Kling was. Now that's enough.

Defendant testified in his own defense. He stated that Verna Berry and Mrs. Hreha were drinking together during the 4th of July barbecue. He said that he and his wife were also drinking and that they had a dispute early in the evening that resulted in her departure for the detoxification center. At about 8 p. m. he gave Verna her medication and she went to bed. When defendant went to bed, between 9 and 9:30 p. m., Mrs. Hreha was still awake and sitting on the couch in the living room. At 12:50 a. m., defendant testified, he got up to have a cigarette and saw Mrs. Hreha lying on the living room floor. He had found her in such a state many times before. When he tried to lift her he realized something was wrong. He summoned Verna, who got up without putting on her glasses. She was "stumbling all over" and "still partially drunk." He checked for a pulse on Mrs. Hreha, found none, and called the police.

Defendant denied that he made any phone calls to Andrea Mains except the one in which he informed her of Mrs. Hreha's death. He testified that he neither had nor attempted to have sexual intercourse with Mrs. Hreha on the night of her death.

At the close of the evidence defense counsel informed the trial court that defendant had decided "to go for murder in the first or nothing." Consequently, the matter was submitted to the jury without instructions regarding lesser included offenses. The jury returned a verdict finding defendant guilty of first-degree murder.

■ 1. On appeal defendant first contends the trial court erred in holding Verna Berry competent to testify at trial. Although Minn.Stat. § 595.02(6) (1980) precludes "persons of unsound mind" from testifying in civil or criminal proceedings, it is well-established that the ultimate question whether a proposed witness is competent to testify is for the trial court to decide in the exercise of its sound discretion. The determination of competency is usually made by means of a preliminary examination of the proposed witness. If the examination demonstrates that the proposed witness understands the obligations of the oath and is capable of correctly narrating the facts to which his testimony relates, he is competent in fact and should be allowed to testify. *State v. Johnson*, 256 N.W.2d 280, 285–86 (Minn.1977).

■ The record amply demonstrates that Verna Berry understood the obligations of the oath and comprehended the events of July 4–5, 1978. The trial court examined Verna at an omnibus hearing conducted on October 20, 1978, four days before commencement of the trial. In response to the trial court's questions Verna stated that she understood the oath and was aware of her obligation to tell the truth. She described the events of July 4–5, 1978, with specificity.

At the omnibus hearing the trial court also heard the testimony of Dr. William Dorsey, a psychiatrist who has treated Verna Berry since 1972. Dr. Dorsey had most recently seen Verna approximately two months before the hearing. In describing her mental condition he explained that she has a propensity toward paranoid delusions: she is "a rather suspicious type individual" who feels that people are "after her" or "out to get her." Dr. Dorsey testified that in his opinion Verna could, as of the time he had most recently examined her, understand the functions of an oath and properly relate the events of July 4–5, 1978.

The trial court again questioned Verna Berry as she began her testimony at trial. Again she stated that she understood her obligation to tell the truth. On this record we cannot conclude that the trial court abused its discretion in permitting her to testify.

■ 2. Defendant next argues the trial court erred in admitting the testimony of Jessie LaFrance, Officer Resch and Sergeant Adler regarding Verna Berry's statements to them. Minn.R.Evid. 803(2) excepts from the rule against hearsay "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Verna Berry's statements to Jessie LaFrance and the police officers meet the requirements of Rule 803(2).

Mrs. Hreha's death, to which Verna's statements relate, clearly affected Verna as a startling event. The police officers who preceded Mrs. LaFrance to the Berry residence testified that upon their arrival Verna appeared distraught and in a state of shock. Officer Resch testified that he attempted to speak with Verna before Mrs. LaFrance appeared, but Verna did not respond. When Mrs. LaFrance arrived at the house, Verna was sitting on the living room couch near Mrs. Hreha's body. Mrs. LaFrance testified that Verna looked "ready to explode." Officer Resch stated that Mrs.

LaFrance was the first person to whom Verna would speak. According to Mrs. LaFrance, Verna was upset throughout their conversation and kept repeating that Mrs. Hreha had cried, "Verna, help me." Verna's conversation with Officer Resch occurred immediately after she spoke with Mrs. LaFrance; her conversation with Sergeant Adler appears to have taken place within the ensuing hour. Sergeant Adler testified that Verna was still upset when he spoke with her. All three conversations clearly occurred while Verna was under the stress of excitement and before she had an opportunity for reflection or contrivance. In these circumstances, the trial court's admission of the testimony of Mrs. LaFrance, Officer Resch and Sergeant Adler regarding Verna's statements to them was not improper.

3. Defendant's third contention is that the evidence adduced at trial was insufficient to support his conviction for first-degree murder. In considering the sufficiency of the evidence to support a conviction, the scope of our review is limited to the question whether the jury, with regard to the presumption of innocence and the state's burden of proving guilt beyond a reasonable doubt, could reasonably have found defendant guilty. *State v. Curtis,* 295 N.W.2d 253, 256–57 (Minn.1980). We recognize that application of Minn.Stat. § 609.185(2) (1980) may in some cases produce a seemingly harsh result. Nevertheless, we must reject defendant's contention that the evidence was insufficient to support his conviction.

■ Minn.Stat. § 609.185(2) (1980) provides that "[w]hoever * * * [c]auses the death of a human being while committing or attempting to commit criminal sexual conduct in the first or second degree with force or violence, either upon or affecting such person or another" is guilty of first-degree murder. In this case the statute requires proof that criminal sexual conduct in the first or second degree [2] was committed

---

**2.** Minn.Stat. § 609.342 (1980) provides in relevant part:

A person is guilty of criminal sexual conduct in the first degree * * * if he engages in

or attempted upon Mrs. Hreha, that force or violence was used and that her death resulted. We conclude, as did the trial court, that the evidence supports the jury's finding that these elements of first-degree murder were proved beyond a reasonable doubt.

■ On the basis of the eyewitness testimony of Verna Berry, her contemporaneous statements to a close friend and the investigating officers, the physical evidence of Mrs. Hreha's position and clothing and the excrement found on her body and on defendant's hand and fingernail, the jury could reasonably find that defendant was engaged in sexual penetration or sexual contact with Mrs. Hreha. Witnesses who were at the scene observed numerous injuries on Mrs. Hreha's body. The autopsy demonstrated that these injuries—including contusions on her inner left thigh, abrasions and a contusion on her external genitalia, and a laceration in her anal canal—were traumatic and had been sustained a short time before her death. In the opinions of Dr. McGee and Dr. Coe, Mrs. Hreha's death resulted from cardiac arrhythmia induced by these injuries.[3] From the nature of Mrs. Hreha's injuries, the evidence that she called for help, and Verna Berry's observations of defendant, the jury could reasonably find that defendant used force to accomplish the sexual penetration or sexual contact and that he caused her injuries and resulting death.[4] Although defendant's testimony was exculpatory, the jury was not required to credit it. Indeed, defendant's

sexual penetration with another person and

\* \* \* \* \* \*

(e) The actor causes personal injury to the complainant, and either of the following circumstances exist:

(i) The actor uses force or coercion to accomplish sexual penetration \* \* \*.

Minn.Stat. § 609.343 (1980) provides in relevant part:

A person is guilty of criminal sexual conduct in the second degree \* \* \* if he engages in sexual contact with another person and if any of the following circumstances exists:

\* \* \* \* \* \*

(e) The actor causes personal injury to the complainant, and either of the following circumstances exist:

(i) The actor uses force or coercion to accomplish the sexual contact \* \* \*.

Minn. Stat. § 609.341 (1980) provides in relevant part:

\* \* \* \* \* \*

Subd. 5. "Intimate parts" includes the primary genital area, groin, inner thigh, buttocks, or breast of a human being.

\* \* \* \* \* \*

Subd. 8.' "Personal injury" means bodily harm as defined in section 609.02, subdivision 7, or severe mental anguish \* \* \*.

\* \* \* \* \* \*

Subd. 11. "Sexual contact" includes any of the following acts committed without the complainant's consent, if the acts can reasonably be construed as being for the purpose of satisfying the actor's sexual or aggressive impulses \* \* \*:

(i) The intentional touching by the actor of the complainant's intimate parts \* \* \*.

Subd. 12. "Sexual penetration" means sexual intercourse, \* \* \*, anal intercourse, or any intrusion however slight into the genital or anal openings of the complainant's body of any part of the actor's body \* \* \*, where the act is committed without the complainant's consent \* \* \*. Emission of semen is not necessary.

Minn.Stat. § 609.02(7) (1980) defines "bodily harm" as "physical pain or injury, illness, or any impairment of physical condition."

3. The medical testimony that Mrs. Hreha's death was caused by cardiac arrhythmia secondary to multiple traumatic injuries was not rebutted at trial. At a postconviction hearing defendant's wife testified that Mrs. Hreha frequently suffered diarrhea. A physician who also testified at the postconviction hearing stated the opinion that, if Mrs. Hreha was suffering from diarrhea at the time of her death, it was possible that her death had been caused by an electrolyte imbalance brought on by the diarrhea. There was no evidence that the evacuation Mrs. Hreha experienced shortly before her death constituted diarrhea. Therefore, the physician's opinion was neither one of medical certainty nor based upon an adequate foundation. We agree with the trial court that this opinion, if proffered at trial, would not have raised a jury question.

4. We acknowledge, and the jury itself was well-aware, that because Mrs. Hreha was an alcoholic of advancing age the trauma that was fatal to her might not have been fatal to another. But defendant's suggestion that Mrs. Hreha's death was not foreseeable has no merit. One who commits a violent act takes his victim as he finds him. In such a situation there is always the possibility of death resulting. See *State v. Smith*, 264 Minn. 307, 119 N.W.2d 838 (1962).

credibility was seriously undermined by Ms. Mains' testimony regarding her telephone conversations with defendant and Sergeant Adler's testimony that defendant stated he touched Mrs. Hreha only to check her pulse.

 4. Fourth, defendant argues that certain evidence was so prejudicial as to require reversal on the ground that he did not receive a fair trial. Defendant's contentions in this regard are without merit. The photographs defendant challenges accurately portray the scene of the events in question and thus meet the requirements of *State v. DeZeler*, 230 Minn. 39, 46–47, 41 N.W.2d 313, 319 (1950). Of the testimony defendant now claims was prejudicial, only one statement was the subject of an objection at trial. In the context of the record as a whole, the challenged statements were not sufficiently prejudicial to require a new trial.

5. Defendant next argues that the trial court erred in failing to instruct the jury regarding lesser included offenses. After the close of the evidence defense counsel informed the trial court that defendant had decided "to go for murder in the first or nothing." Defendant makes no claim that defense counsel's statement did not constitute a valid waiver. We have consistently held that when a defendant waives his right to have the jury instructed regarding lesser included offenses, he is precluded from raising the issue on appeal. *State v. Wiberg*, 296 N.W.2d 388 (Minn. 1980); *State v. Scheerle*, 285 N.W.2d 686 (Minn.1979).

6. Defendant finally contends he was denied a fair trial because his attorney represented him inadequately. "[T]rial counsel fails to render effective assistance when he does not exercise the customary skills and diligence that a reasonably competent attorney would perform under similar circumstances." *United States v. Easter*, 539 F.2d 663, 666 (8th Cir. 1976), *cert.*

denied, 434 U.S. 844, 98 S.Ct. 145, 54 L.Ed.2d 109 (1977); quoted in *White v. State*, 309 Minn. 476, 480, 248 N.W.2d 281, 285 (1976). Defendant's criticisms of his attorney amount to no more than criticisms of his attorney's trial strategy.[5] The record does not demonstrate that defendant's attorney performed any function in an incompetent manner. We are not persuaded that defendant was denied effective assistance of counsel.

Affirmed.

SCOTT, J., took no part in the consideration or decision of this case.

5. The waiver of lesser included offenses involved a substantial loss for defendant, but the potential advantage to him was no less substantial. Only with the greatest reluctance would a jury return a verdict of guilty of first- degree murder under a statute requiring neither intent nor premeditation for conviction. If the jury in this case had returned a verdict of not guilty of first-degree murder, defendant could not have been found guilty of another offense.