STATE of Wisconsin, Plaintiff-Respondent,

v.

Monte L. NOREN, Defendant-Appellant.†

Court of Appeals

No. 84-2156-CR. Submitted on briefs April 29, 1985.—
Decided June 4, 1985.
(Also reported in 371 N.W.2d 381.)

---

† Petition to review pending. This petition was not decided at the time the volume went to press. Its disposition will be reported in a later volume.

For the appellant there were briefs by *John E. Tradewell,* assistant state public defender.

For the respondent there was a brief by *Bronson C. La Follette,* attorney general, and *Stephen W. Kleinmaier,* assistant attorney general.

Before Cane, P.J., Dean and LaRocque, JJ.

CANE, P.J.   Monte Noren appeals a judgment convicting him of second-degree murder, sec. 940.02(2), Stats. The jury found that Noren killed Joseph Lebakken as a natural and probable consequence of the commission of a felony. The underlying felony was robbery. Noren argues that the evidence was insufficient to prove beyond a reasonable doubt that Lebakken's death was the natural and probable consequence of the robbery. He also argues

that the trial court improperly refused to disqualify a prospective juror who allegedly was related by marriage to Lebakken. Because the evidence was sufficient and because the juror was not related by marriage to the victim, we affirm the judgment.

We review the evidence in the light most favorable to the verdict. *See Turner v. State,* 76 Wis. 2d 1, 10, 250 N.W.2d 706, 711 (1977). Applying this standard, the record shows that Noren struck Lebakken on the head three times during a robbery. He struck the blows with his closed fist, causing his knuckles to bleed. A witness to the crime was concerned that Noren's blows would kill Lebakken. Lebakken was extremely drunk at the time of the robbery. His blood alcohol content was .38% and his urine alcohol content was .48% at the time of death. Noren knew that Lebakken was very drunk.

Noren's blows caused Lebakken to lose consciousness and to become comatose. His extreme intoxication contributed to the loss of consciousness. Lebakken suffered from a preexisting respiratory disease that impeded the removal of mucus from his lungs. This condition, in association with the coma, caused death by asphyxiation. Noren did not know about Lebakken's respiratory disease.

## NATURAL & PROBABLE CONSEQUENCE

The state prosecuted Noren for second-degree murder under sec. 940.02(2). The statute provides that whoever causes death as a natural and probable consequence of the commission of a felony is guilty of second-degree murder. This is known as the felony-murder rule. Noren contends that death is not a natural and probable consequence of striking a person's head with a fist.

The phrase "natural and probable" has not been defined under the felony-murder statute. The parties con-

cede that to be a natural consequence of a felony, death must be proximately caused by the defendant's conduct. The test of cause is whether the defendant's conduct was a substantial factor in causing the death. *See State v. Serebin,* 119 Wis. 2d 837, 846, 350 N.W.2d 65, 70 (1984). It is undisputed on appeal that Noren's conduct caused Lebakken's death. The critical issue therefore is whether death was a probable consequence of striking Lebakken's head.

Although the parties agree that "probable" relates to the foreseeability of death, they disagree about how foreseeable death must be. We agree that foreseeability requires different degrees of certainty in different contexts. To constitute negligence, harm must be probable rather than merely possible. *Wisconsin Power & Light Co. v. Columbia County,* 18 Wis. 2d 39, 42–43, 117 N.W. 2d 597, 599 (1962). Negligent homicide requires that conduct create a high probability of death or great bodily harm. *State v. Hart,* 75 Wis. 2d 371, 383, 249 N.W.2d 810, 815 (1977). "High probability" is defined as a probability that the ordinary person, having in mind all the circumstances, including the seriousness of the consequences, would consider unreasonable. It does not mean that the mathematical probability of the consequences must be greater than fifty percent. *Id.* at 383–84 n. 4, 249 N.W.2d at 815 n. 4. Death caused by conduct evincing a depraved mind, sec. 940.02(1), Stats., requires that the defendant's conduct be imminently dangerous to human life. "Imminently dangerous" means that the conduct is dangerous in and of itself; it must have been inherently, apparently, and consciously dangerous to life and not such as might casually produce death by misadventure. *Balistreri v. State,* 83 Wis. 2d 440, 455, 265 N.W.2d 290, 296 (1978). No Wisconsin appellate decision has addressed the certainty required for death to be foreseeable under the present felony-murder statute.

The statutory requirement that death be a probable consequence of a felony is intended to limit felony-murder liability to situations where the defendant's conduct creates some measure of foreseeable risk of death. *See* Model Penal Code § 201.2 Comment 4C at 37 (Tent. Draft No. 9 1959). Under the predecessor felony-murder statute, a defendant committed murder when death resulted from the commission of any felony. *Pliemling v. State,* 46 Wis. 516, 519, 1 N.W. 278, 279 (1879). This rule was modified because it imposed severe criminal sanctions without considering the moral culpability of the defendant. *See Commonwealth v. Matchett,* 436 N.E.2d 400, 409 (Mass. 1982).

Because felony-murder is a Class B felony, we conclude that the level of foreseeability should be the same as for depraved mind murder, which is also a Class B felony. Under this test, the acts causing death must be inherently dangerous to life. We apply this test to felony-murder because it requires a high degree of foreseeability, thereby implictly requiring greater culpability than lesser grades of homicide. Our supreme court applied this standard under the predecessor felony-murder statute when it stated that the act constituting the felony must be in itself dangerous to life. *Pliemling,* 46 Wis. at 521, 1 N.W. at 281.

Our conclusion is supported by the fact that most other jurisdictions apply the inherently dangerous test in felony murder cases. *State v. Underwood,* 615 P.2d 153, 160 (Kan. 1980). In *State v. Harrison,* 564 P.2d 1321, 1324 (N.M. 1977), the New Mexico Supreme Court adopted the "natural and probable" test, which it defined as the "inherently or foreseeably dangerous to human life test." Most courts that have recognized the inherently dangerous test have relied on language from an English case, *Regina v. Serne,* 16 Cox Crim. Cases 311 (Central Crim. Ct. 1887), as stating the basis of the

modern felony-murder rule. *See Matchett,* 436 N.E.2d at 409. In *Regina,* 16 Cox Crim. Cases at 313, the court stated:

[I]nstead of saying that any act done with intent to commit a felony and which causes death amounts to murder, it would be reasonable to say that any act known to be dangerous to life, and likely in itself to cause death, done for the purpose of committing a felony which causes death, should be murder.

We are persuaded that Wisconsin's felony-murder statute originates from this case and that the inherently dangerous test applies.

## SUFFICIENCY OF THE EVIDENCE

The trial court correctly instructed the jury in this case that the acts constituting the robbery must have been "in and of themselves dangerous to the life of Joseph Lebakken." Whether Noren's conduct was inherently dangerous must be determined from the conduct itself and the surrounding circumstances. *Wagner v. State,* 76 Wis. 2d 30, 44–45, 250 N.W.2d 331, 339 (1977). Whether the conduct was inherently dangerous is not determined by considering only the abstract qualities of the underlying felony. *Contra People v. Satchell,* 489 P.2d 1361, 1369 (Cal. 1971). We review the evidence to determine whether a reasonable jury could be convinced beyond a reasonable doubt that Noren's conduct was inherently dangerous. *Turner,* 76 Wis. 2d at 10, 191 N.W. 2d at 711. If more than one reasonable inference can be drawn from the evidence, we must accept the inference supporting the verdict. *Id.*

Noren argues that striking a person's head three times with a fist is not inherently dangerous. He relies on *Beauregard v. State,* 146 Wis. 280, 289, 131 N.W. 347, 351 (1911), where our supreme court stated that striking a person's head with a gun barrel generally would

not cause death. The state argues that striking a very intoxicated person who has a respiratory disease is inherently dangerous. According to this argument, the specific traits of the victim must be considered when deciding whether conduct is dangerous. *See Turner,* 76 Wis. 2d at 13, 250 N.W.2d at 713. The state also argues that one who commits a violent crime takes his victim as he finds him. *See State v. Berry,* 309 N.W.2d 777, 784 n. 4 (Minn. 1981).

We agree that generally death is not the natural and probable result of a blow with a hand. *See* 40 Am. Jur. 2d *Homicide* § 268 (1968). Our inquiry is not complete, however, because the particular traits of the victim also must be considered. Conduct that is unlikely to cause the death of a healthy adult may be dangerous to others. *Virgil v. State,* 84 Wis. 2d 166, 175, 267 N.W.2d 852, 857 (1978). Only special attributes that the defendant was aware of may be considered. *Id.* Conduct does not become inherently dangerous on the basis of latent danger. *Wangerin v. State,* 73 Wis. 2d 427, 434, 243 N.W.2d 448, 452 (1976). The truism that a defendant takes his victim as he finds him, therefore, does not apply to this case. The proposition applies in tort law when assessing damages. It also applies in criminal law when deciding the issue of causation. *See Berry,* 309 N.W.2d at 784. The unknown qualities of a victim, however, are irrelevant to the issue of foreseeability of death.

Applying the inherently dangerous test to this case, we conclude that sufficient evidence supports Noren's conviction. Although Lebakken's respiratory disease was irrelevant to the issue of inherent danger, his extreme intoxication was a factor that distinguished him from a healthy adult. Striking an intoxicated person exposes him to familiar risks that a sober person would not face. He may fall and fatally strike his head. He also may asphyxiate from vomit while unconscious. Although

Lebakken did not die from either of these causes, the jury could consider such possibilities when determining whether Noren's conduct was inherently dangerous. We conclude that a reasonable jury could have been convinced beyond a reasonable doubt that his conduct was inherently dangerous.

## JUROR DISQUALIFICATION

Section 805.08(1), Stats., requires the trial court to disqualify potential jurors who are related by marriage or blood to a party in an action. Here, Noren claims that the trial court improperly refused to disqualify a juror who was related by marriage to Lebakken. The juror's second cousin was married to Lebakken's sister.

The trial court properly exercised its discretion by refusing to disqualify the juror. Marriage does not cause the blood relatives of one spouse to become related to the blood relatives of the other spouse. *See* Wharton, Criminal Procedure § 450 (12 ed. 1975) (affinity by reason of the marriage of a party's relative to the relative of an adverse party does not require disqualification). *Maahs v. Schultz*, 207 Wis. 624, 636, 242 N.W. 195, 200 (1932), supports our conclusion. In *Maahs* the sister of a juror was married to a cousin of one of the parties. Our supreme court stated that this relationship was not close enough to require disqualification of the juror. Similarly, the relationship in this case between the juror and Lebakken did not require disqualification.

*By the Court.*—Judgment affirmed.